IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WM HIGH YIELD FUND, et al.        :        CIVIL ACTION
       :
       v.        :
       :        No. 04-3423
MICHAEL A. O'HANLON, et al.        :

## MEMORANDUM

Legrome D. Davis, J.                                               June 27, 2013

Plaintiffs – six institutional Funds[1] that invested in debt securities issued by Diagnostic

Ventures, Inc. (DVI) – sue for violations of Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b) and Rule 10b-5(a),(c), 17 C.F.R. § 240.10b-5(a),(c), and imposition of

liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[2] Jurisdiction is the

Exchange Act, 15 U.S.C. § 78aa, and federal question, 28 U.S.C. § 1331.

Defendant Terry W. Cady – a former executive of DVI Business Credit, Inc. (DVI BC), a

subsidiary of DVI[3] – moves for summary judgment (Doc. No. 260). Fed. R. Civ. P. 56. Among

other reasons, the motion asserts that the record is devoid of evidence to support essential

elements of a private securities action[4] – primarily, reliance by the Plaintiff Funds on any

---

[1] The Plaintiff Funds are WM High Yield Fund; WM Income Fund; WM VT Income Fund; AT High Yield Fund; AT Income Fund; and Stellar Funding, Ltd.

[2] For the history and factual background of this action see WM High Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446 (E.D. Pa. May 13, 2005) (Apr. 29, 2005 Order and May 13, 2005 Amended Mem., Doc. Nos. 108, 112; and Feb. 23, 2006 Order, Doc. No. 165).

[3] Diagnostic Ventures, Inc. (DVI, Inc.) was a Delaware corporation with two operating subsidiaries, DVI Business Credit, Inc. ("DVI BC") and DVI Financial Services, Inc. ("DVI FS"). Compl. ¶¶ 3, 54-55.

[4] The essential elements of a Section 10(b) and Rule 10b-5 private cause of action are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008); accord Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 n.3 (U.S. 2011).

manipulative or deceptive conduct by Cady. Def. Br., Doc. No. 260 at 14-15, 22-26; Def. Reply Br., Doc. No. 282 at 8-9.

Plaintiffs oppose summary judgment, broadly asserting that a group of individual named Defendants – defined in the Complaint to include Cady – were "directly and personally involved in the improper and deceptive practices that artificially inflated DVI's reported financial results." Compl. ¶ 40, Pls. Br., Doc. No. 275 at 4. Plaintiffs relied upon DVI's financial statements in deciding to invest in its bonds. Id. at 9-10.

As to Cady, Plaintiffs say that he "was directly involved and responsible for some of the very mechanisms used to falsify DVI, Inc.'s financial statements." Pls. Br., Doc. No. 275 at 7. Specifically, it is asserted that Cady engaged in a manipulative and deceptive "round-trip financing scheme" between DVI BC and DVI Financial Services, Inc. (DVI FS) – another subsidiary of DVI. Id. at 7-8. This, it is said, "was intended to and did" conceal delinquent and defaulted loans, "artificially reducing the [reserve] allowance for loan losses on DVI's financial statements." Id. at 7-8. Also, they say: Cady – as "one of the decision makers" – "was integral to a scheme to understate DVI, Inc.'s allowance for loan losses, a critically important item" for DVI as a finance company. Id. at 8, 10. In Plaintiffs' view, these activities establish Cady's fraudulent state of mind, because they "went directly to the core of DVI's business." Id. at 9.

Furthermore, Defendant Cady's motion for summary judgment asserts that he cannot be held liable under Section 20(a) because the record does not contain proof of a threshold requirement – that he actually controlled DVI, the alleged violator of the securities laws, Section 10(b). Def. Br., Doc. No. 260 at 14, 26-29; Def. Reply Br., Doc. No. 282 at 9-10. As to Section 20(a)'s other requirements, it is asserted that Cady was not a culpable participant in DVI's fraud

and he acted in good faith.  Def. Br., Doc. No. 260 at 30-31; Def. Reply Br., Doc. No. 282 at 10.

Plaintiffs contend that Cady's executive position – in conjunction with their proof of DVI BC's

round-trip financings and DVI's understated loan loss reserves – establish his control of DVI.

Pls. Br., Doc. No. 275 at 10-11.  And they say triable disputes exist as to these issues.[5]  Id.

    The motion for summary judgment will be granted.  The record does not show that the

Plaintiff Funds relied on any manipulative or deceptive conduct or statements made by Cady.

Also, the record establishes that Cady was not a person who had actual power or influence over

the allegedly controlled violator of the securities laws, DVI.

I.      PROCEDURAL AND FACTUAL BACKGROUND

    The Complaint, as filed on July 19, 2004, avers that during August 10, 1999 through

August 13, 2003, the Plaintiff Funds invested in DVI's bonds that traded on the New York Stock

Exchange (NYSE) – 9 $^{7/8}$ percent "Senior Notes," which had been issued in 1997 and 1998.[6]

Compl. ¶¶ 1, 12, 285.  During that four-year period, it is averred that Cady, individually and

together with other DVI officers, directors, and business entities "engaged in a scheme to falsify

DVI's financial results and overstate its earnings by at least $120 million."  Id. ¶ 1.  This was

done to "deceive . . . the investing public as to the true financial condition of DVI," and

---

[5] Both sides submitted proposed undisputed facts, and Plaintiffs' submission responded specifically to the facts stated by Defendants, disputing and objecting to many.  Defs. Statement of Facts (SOF), Doc. No. 260 at 4-8; Pls. Counter-Statement of Facts (CSOF), Doc. No. 276.  Those responses do not present any genuine disputes material to a decision on the motion for summary judgment presented here.

[6] The Complaint invokes a presumption of reliance on "the integrity of the market price of the Senior Notes."  Compl. ¶¶ 1, 12, 285, 290, 297.  Under the "fraud-on-the-market doctrine, a plaintiff investor that buys or sells a publicly-traded security may invoke a rebuttable presumption of reliance on the integrity of the market price for that security.  Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988).  Most publicly available information is reflected in the security's market price.  Id.  When statements or conduct become public, "[t]hen it can be assumed that an investor who buys or sells stock at the market price relies upon the statement [or conduct]."  Stoneridge, 552 U.S. at 159 (citing Basic, 485 U.S. at 247).

"artificially inflate and maintain the market price of DVI's securities" – all in violation of Section

10(b) and Rule 10b-5. Id. ¶¶ 6, 32, 40, 44, 238-239, 241, 246, 291-299 (Count I).

On August 13, 2003, DVI disclosed its intention to file for bankruptcy protection.

Compl. ¶¶ 8, 197. On August 25, 2003, DVI, DVI FS, and DVI BC filed for Chapter 11

bankruptcy protection and began liquidating assets. Id. ¶¶ 10, 45, 200. On April 7, 2004, the

Chapter 11 Examiner, R. Todd Neilson, CPA – who had been appointed by the U.S. Bankruptcy

Court for the District of Delaware to investigate the Debtor DVI's financial transactions,

accounting practices, and alleged wrongdoing, among other topics – issued his report. Id. ¶ 11;

Examiner's Report, dated April 7, 2004, Decl. of James P. McEvilly, III, Ex. 3, Doc. No. 277-2

through 277-4 at 69.

Cady was Chief Executive Officer, President, and a Director of DVI BC from

approximately January or February, 2000, until March 26, 2004.[7] Compl. ¶ 32; Jan. 23, 2008

Cady Dep., 86:6-8, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 3. See also Examiner's Report at

17, McEvilly Decl., Ex. 3, Doc. No. 277-2 at 22; Pls. Omnibus Br. in Opposition to All Defs.

Mots. to Dismiss the Compl. at 10, Doc. No. 63 at 31. It is averred that Cady "was primarily

responsible for overseeing the operations and marketing for DVI BC." Compl. ¶ 32. It is averred

that the group of named individual Defendants, which is defined to include Cady, "was

responsible for or participated in drafting, producing and disseminating the false and misleading

---

[7] Plaintiffs assert that during the pertinent time period, Cady was also a Senior Vice President of
DVI. See, e.g., Compl. ¶ 32; Pls. Br., Doc. No. 275 at 6; Pls. Omnibus Br. in Opposition to All Defs. Mots.
to Dismiss at 10, 67-68, Doc. No. 63 at 31, Doc. No. 63-1 at 14-15 & n.1; Pls. CSOF ¶ 11. This is incorrect.
The record discloses that Cady did not learn that he also held that title until June, 2003, and he "did not have
any responsibilities or duties related to the operations of DVI, Inc. beyond those [he] had as President and
Director of DVI BC." Cady Decl. ¶¶ 3-4, Def. Ex. 11, Doc. No. 260-13 at 2. In addition, he was never an
officer of DVI FS. Id. at ¶ 2, Def. Ex. 11, Doc. No. 260-13 at 2. See also Jan. 23, 2008 Cady Dep., 182:4-6,
Def. Ex. 5, Doc. No. 260-6 at 5.

statements alleged . . . and orchestrating the deceptive scheme to manipulate the Company's credit and accounting practices and policies." Id. ¶¶ 44, 40-44.

The Complaint contains no averments as to any actionable statements made specifically by Cady. Based in large part on the Examiner's findings, the Complaint contains only some averments as to actionable conduct specifically by Cady:

- "DVI did not want its lenders or the investing public to know that the loans and leases in the Securitization were not performing or in default. Therefore, . . . Cady and others developed a scheme to lend cash from DVI BC to a health care provider who was delinquent on its DVI FS loan or lease. These cash-strapped healthcare facilities from DVI BC were not supported by new collateral." Compl. ¶ 65. See id. ¶¶ 60-67 (alleged use of "round-trip" financing to conceal impaired loans and leases).

- "DVI BC either wrote a check to DVI FS or wired enough cash to DVI FS to make the loan or lease appear performing. These transfers from DVI BC to DVI FS came to be called "round trip" financing or "round tripping" because DVI would generally reimburse DVI BC for the funds advanced to borrowers to avoid defaulting on DVI FS's loans. Compl. ¶ 66; see id. ¶¶ 60-67.

- "DVI BC's President, Cady . . . knew of and approved these round trip financings using DVI BC as the conduit." Compl. ¶ 90. See id. ¶¶ 81-95 (DVI's alleged manipulation of loans to hide delinquencies).

- Cady is mentioned once in the cited press releases: "Defendant O'Hanlon reported . . . 'I am pleased that Terry Cady has joined us to lead the growth of DVI Business Credit and expand its contribution to DVI.'" Compl. ¶ 118.

- As to scienter, others were aware of steps "Cady and others took to falsely enhance DVI's reported financial condition and prospects." Compl. ¶ 239.

- Also to scienter, "Cady knowingly or recklessly approved of numerous round trip financings using DVI BC to make payments on debts owed to DVI FS in which no funds were ever actually received from the borrower." Compl. ¶ 241.

In addition, it is averred that the group of named individual Defendants were "controlling persons of DVI" under 15 U.S.C. § 78t. Compl. ¶¶ 41, 300-303 (Count II). "By reason of" their positions with DVI, it is averred, they "controll[ed] the content" of its public statements, and they

5

"participated in the drafting, preparation, and/or approval of such statements." Id. ¶¶ 41, 42-44, 303. Also "[b]y virtue of" their positions, they "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading." Id. ¶ 301. And given their "direct involvement in the day-to-day operations of the Company," it is contended, they are "presumed to have had the power to control or influence the particular transactions giving rise to the securities violations" here. Id. ¶ 302. In regard to the individual Defendants' alleged control of DVI, the Complaint does not contain any averments as to any conduct or statements made specifically by Cady.

On November 1, 2004, Cady, and other Defendants, separately moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Def. Cady's Mot, Doc. No. 38. As to Cady, the Court dismissed all claims except those asserting scheme liability[8] under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5(a), (c), 17 C.F.R. § 240.10b-5(a), (c) (Count I), and liability as a "controlling person" under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (Count II). WM High Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446, at *6, 8, 9-10, 14-15, 17-18 (E.D. Pa. May 13, 2005) (Apr. 29, 2005 Order and May 13, 2005 Amended Mem., Doc. Nos. 108, 112; and Feb. 23, 2006 Order, Doc. No. 165). Specifically, it was ruled that the Complaint does not contain any averments that Cady

_____

[8] Subsections (a) and (c) of Rule 10b-5, respectively, make it unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud." 17 C.F.R. § 240.10b-5(a), (c). Subsection (b) of Rule 10b-5 prohibits "mak[ing] any untrue statement of material fact" or omitting a material fact necessary to clarify prior misleading statements. 17 C.F.R. § 240.10b-5(b). "We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements." In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011), abrogated on other grounds, 133 S.Ct. 1184 (U.S. 2013).

made an actionable statement or omission and, as to him, the Rule 10b-5(b) claims were

dismissed.  Id., 2005 WL 6788446, at *6, 8 (also "only Defendants to whom a misleading

statement is attributable may be held liable").  It was also ruled that to the extent Plaintiffs sought

to hold Cady, among other Defendants, "liable as 'secondary' violators" under Section 10(b),

those claims were dismissed.  Feb. 23, 2006 Order, Doc. No. 165; see also WM High Yield

Fund, 2005 WL 6788446, at *7 (ruling that Cent. Bank of Denver, N. A. v. First Interstate Bank

of Denver, N. A., 511 U.S. 164 (1994) precluded "secondary" or "aiding and abetting" liability).

By Order dated February 26, 2013 (Doc. No. 304), the parties were permitted to

supplement their moving papers with concise briefing on significant rulings recently issued by

the Supreme Court, our Court of Appeals, and this Court.  Neither the Plaintiff Funds nor

Defendant Cady submitted supplementary papers.[9]  The motion for summary judgment will

now be decided.

II.     SUMMARY JUDGMENT FINDINGS OF UNDISPUTED MATERIAL FACT

1.      The Complaint does not contain any averments that Cady made a public statement

about DVI – at any time, to anybody.  See WM High Yield Fund, 2005 WL 6788446, at *6, 8.

See also Def. Cady's Statement of Facts (SOF) ¶ 11, Doc. No. 260; Pls. Counter-Statement of

Facts (CSOF) ¶ 11, Doc. No. 276.

2.      The Complaint does not contain any averments that Cady made any false,

misleading, or fraudulent statements or omissions contained in DVI's public filings with the

Securities and Exchange Commission (SEC).  See WM High Yield Fund, 2005 WL 6788446, at

*6, 8; see also Def. Cady's SOF & Pls. CSOF, ¶ 11.

---

[9]  In this action, fact discovery closed on May 2, 2008 (Seventh Am. Case Mgmt. Order, Doc. No.
243), and expert discovery closed on March 2, 2009 (Ninth Am. Case Mgmt. Order, Doc. No. 250).

3.     The Complaint does not contain any averments that the Plaintiff Funds relied on any conduct or statements made by Cady in deciding to purchase or sell DVI's securities.  See Def. Cady's SOF & Pls. CSOF, ¶¶ 11, 12.

4.     On occasions during the pertinent time period, August 10, 1999 through August 13, 2003, DVI BC transferred funds to DVI FS for certain purposes, and DVI BC received subsequent repayments from DVI FS, which Barry Jay Epstein, Ph.D., CPA[10] described:

> The DVI BC division specialized in advancing funds against medical (Medicare, Medicaid, private insurer) receivables.  It also advanced funds to certain borrowers under equipment loans, generally made by DVI FS.  The DVI BC division furthermore provided funds to existing DVI FS debtors for the purpose of servicing debts due to that division, essentially lending money to customers that were unable to service already extant debt.  While this is not prohibited, the practice has obvious implications for the analysis of needed bad debt reserves.  Additionally, the DVI BC loans were sometimes later incorporated into "rewritten" DVI FS loans . . . . This practice raises several concerns, including the propriety of adding amounts to the equipment-backed debt that would cause the existing collateral to become insufficient for the revised loan balance.

Oct. 3, 2008 Epstein Report at 60, Def. Ex. 9, Doc. No. 260-11 at 3.  See also Def. Cady's SOF ¶¶ 16, 22.

5.     For example, DVI BC received funds via inter-company transfers from DVI FS for outstanding payments due on funds that DVI BC had provided to Health Integrated Services, Inc. (HIS).  Def. Cady's SOF ¶ 22; Examiner's Report at 75, McEvilly Decl., Ex. 3, Doc. No. 277-3 at 15 ("lease payments due under the contracts were . . . being substantially paid and applied by an advance from DVI BC to DVI FS and a subsequent payment in the form of an inter-company loan directly from DVI FS to DVI BC for the outstanding loan payments").

---

[10]  Plaintiffs in a related class action securities action, In re DVI, Inc. Sec. Litig., No. 2:03-cv-5336-LLD, designated Mr. Epstein as an expert.  His factual description of the fund transfers is pertinent here.

6.      Cady testified that he was aware of advances on DVI BC loans to fund DVI FS debt: "I'm aware that that happened on three or four occasions, yes." Jan. 28, 2008 Cady Dep., 224:2-8, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 8-9.

7.      Cady testified that "[there were many, many occasions, . . . where DVI Business Credit funded an equipment loan payment through available credit – collateral." Jan. 28, 2008 Cady Dep., 224:17-21, 224:17-225:18 (the terms of the loan agreements required this), McEvilly Decl., Ex. 1, Doc. No. 277-1 at 9.

8.      Casdy testified: "I know that DVI FS refinanced assets, and out of the proceeds of some of those, they repaid DVI BC debt, yes." Jan. 23, 2008 Cady Dep., 538:11-18, 538:1-18, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 14-15.

9.      Cady testified that the decision in some instances to over-advance funds to borrowers that could not make debt-payments on loans by DVI FS "was a business decision made by DVI, Inc." Jan. 23, 2008 Cady Dep., 226:11-21, Def. Ex. 5, Doc. No. 260-6 at 10; Def. Cady's SOF ¶ 17. See Pls. Omnibus Br. at 14, 18, 72, Doc. No. 63 at 35, 39 & Doc. No. 63-1 at 19 (asserting DVI BC "over-advanced" funds in the sense that the advance exceeded the borrower's collateral).

10.     Cady testified:

> And the question is, do you consciously over advance? And it has a lot to do with whether or not you're prepared to put that client out. Is it for payroll? Are you [the borrower] going to make payroll on Friday? Can he pay it back on Tuesday? Wednesday's payment is coming in. Is there other accounts receivable collateral that we can back-stop ourselves with? Those kinds of decisions happen. And on occasion, you will consciously say yes, I'll do that to keep you - - to keep you open.

Jan. 23, 2008 Cady Dep., 422:1-13, Def. Ex. 5, Doc. No. 260-6 at 13; Def. Cady's SOF ¶ 18.

11.    John P. Boyle – Vice President, Chief Accounting Officer and Secretary of DVI,

DVI FS, and DVI BC – testified:

> I discussed the nature of the advances, and Terry Cady would indicate that typically it was to overcome short-term cash flow problems with customers, in some instances, but in some instances, longer term, sort of a working situation.
>
> But in all instances, these were good loans; they were subject to credit review, and that they would include, in addition to the receivables collateral that Business Credit used for their business, they would have other collateral, including a blanket lien on all the company's assets, peculiar assets like the provider numbers, which are valuable assets and those types of things. In summary, the collateral we had for these loans was sufficient to ensure their collection.

Mar. 4, 2008 Boyle Dep., 489:13-490:9, Def. Ex. 10, Doc. No. 260-12 at 3.

12.    Steven R. Garfinkel – Executive Vice President and Chief Financial Officer of

DVI, DVI FS, and DVI BC – testified:

> The act – the act of lending money to a company for them to service debt, inherently there is nothing wrong with that. That happens in loan workouts all the time. Sometimes you make it as an equity investment. A lot of times banks will look at situations where they don't want a default because they don't want other lenders coming in and they have to protect their position. Sometimes it is called good money after bad. Sometimes it is called you have got to do what you have got to do to keep a company going, and you make – and you make the decision.

Mar. 26, 2008 Garfinkel Dep., 477:3-16, Def. Ex. 6, Doc. No. 260-7 at 10.

13.    Cady was aware that some loans in DVI BC's portfolio did not have "appropriate accounts receivable collateral," and he testified: "All of those would have been ones that didn't have sufficient accounts receivable collateral but had other collateral." Jan. 28, 2008 Cady Dep., 145:3-146:21, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 4-5.

14.    As to DVI's loan loss reserves that were recorded on its financial statements, Cady testified: "And I was not routinely – let me strike that. I don't think I was ever asked to comment on things like the company's loss reserves . . . ." Jan. 23, 2008 Cady Dep., 391:14-17, Def. Ex. 5, Doc. No. 260-6 at 12.

15.     Cady testified as to his role in setting loan loss reserves, as follows:

> One of preparing the documentation and justification for whether there was – and recommendation whether there should be one or there shouldn't be one or of what nature. I prepared quarterly reports that were submitted to senior management, which included Mike O'Hanlon and went through John Boyle.

2008 Cady Dep., 243:8-244:1, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 10-11.

16.     As to who was "your ultimate decider as to whether or not to take a loan loss reserve," Cady testified:

> That decision could have been made at my level or Tony's level or Rich Miller's level.  But in most cases, it would have been Mike O'Hanlon's level. . . . I was with Mr. O'Hanlon and various members of Deloitte when there was a discussion of Business Credit's special assets and the nature of those and our explanation of why we felt there should be a reserve or not a reserve on one occasion.

2008 Cady Dep., 244:7-10, 18-23, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 11.

17.     Cady had neither the authority nor the duty to decide whether DVI should suspend recognition of income on delinquent or defaulted loans:  "I had recommending powers . . . ." Jan. 23, 2008 Cady Dep., 249:22-250:12, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 12-13.  As to who had the "ultimate power" to decide to do so, he testified:

> That would have been a decision I would have recommended to Steve Garfinkel, and Steve Garfinkel would have made that decision in consultation with Mike O'Hanlon.

And as to whether O'Hanlon  was "the final decision-maker on these issues," Cady testified:  "I think its fair to say he was, yes."  Jan. 23, 2008 Cady Dep., 250:5-20, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 13.

18.     The record does not contain any evidence that Cady made a public statement about DVI – at any time, to anybody – and none of the allegedly false and misleading statements averred in the Complaint was ever publicly attributed to Cady.  See WM High Yield Fund, 2005

11

WL 6788446, at *6, 8; see also Def. Cady's SOF & Pls. CSOF, ¶ 11; Compl. ¶¶ 104-181 (alleged misstatements).

19.     The record does not contain any evidence that Cady acted in a misleading, manipulative, deceptive, or fraudulent manner – and none of the allegedly fraudulent conduct averred in the Complaint was ever publicly attributed to him.  Def. Cady's SOF & Pls. CSOF, ¶¶ 11, 12.

20.     The record does not contain any evidence of public conduct or statements made by Cady that affected the market price for DVI's securities.

21.     The record does not contain any evidence that Cady publicly made or adopted any false, misleading, or fraudulent statements or omissions contained in DVI's public filings.  See WM High Yield Fund, 2005 WL 6788446, at *6, 8; see also Def. Cady's SOF & Pls. CSOF, ¶¶ 11, 12.

22.     The record does not contain any evidence that the Plaintiff Funds relied on any public conduct or statements made by Cady in deciding to purchase or sell DVI's securities.  See Def. Cady's SOF & Pls. CSOF. ¶¶ 11, 12.

23.     During the pertinent time period, Cady was CEO, President, and a Director of DVI BC, and he was not a Senior Vice President or other high-ranking officer of DVI.  Def. Cady's SOF & Pls. CSOF, ¶¶ 9, 13.  See also Jan. 23, 2008 Cady Dep., 86:6-8, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 3; Examiner's Report at 17, McEvilly Decl., Ex. 3, Doc. No. 277-2 at 22; Pls. Omnibus Br. at 10, 67-68, Doc. No. 63 at 31 & Doc. No. 63-1 at 14-15 & n.1.

24.     Cady reported directly to DVI's CEO, O'Hanlon.  Def. Cady's SOF ¶ 10; Jan. 23, 2008 Cady Dep., 251:13-16, Def. Ex. 5, Doc. No. 260-6 at 11; Mar. 25, 2008 Garfinkel Dep., 156:10-12, Def. Ex. 6, Doc. No. 260-7 at 5.

25.     Cady was not a member or participant of DVI's Board of Directors – except for one meeting during which he gave the Board "an update on our collection efforts," and he did not sign any of DVI's filings with the SEC.  Def. Cady's SOF ¶¶ 9, 13; Jan. 23, 2008 Cady Dep., 192:9-193:13, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 6-7; Pls. Omnibus Br. at 67-68, Doc. No. 63-1 at 14-15 & n.1.

26.     DVI's Executive Vice President, Richard E. Miller, was known as the "right-hand man" of DVI's CEO, O'Hanlon.  Compl. ¶ 29.

27.     Miller largely exercised day-to-day control over the inter-company transfers of funds between DVI FS and DVI BC.  Mar. 31, 2008 Garfinkel Dep., 1473:2-9, 1482:2-21, Def. Ex. 6, Doc. No. 260-7 at 12-13.  See also Examiner's Report at 75, McEvilly Decl., Ex. 3, Doc. No. 277-3 at 15 ("According to [Defendant] Colasanti, all HIS over advances were approved by 'one and only one person, Rich Miller.'").

IV.     DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  This requires "affirmative evidence . . . from which a jury might return a verdict in his favor."  Id. at 257; Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (must set forth specific facts showing the existence of a genuine issue for trial); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (ruling that "[w]here the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial") (citation and internal quotation marks omitted).

After adequate time for discovery, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. The moving party discharges its burden by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." Id. at 325. If the movant succeeds in doing so, there can be no genuine triable disputes because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323-25.

A.    Section 10(b) and Rule 10b-5 Claims

Plaintiffs have the burden of proving at trial their reliance upon manipulative or deceptive conduct by the defendant – elements for proof in any private action under Section 10(b) and Rule 10b-5(a) and (c). Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008) (reliance is an "essential" element); accord Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 n.3 (U.S. 2011); Central Bank, 511 U.S. at 180 ("critical for recovery under 10b-5"); Basic. Inc. v. Levinson, 485 U.S. 224, 243 (1988) ("[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury").

Considering the record as a whole together with the additional facts submitted by the parties, there are no triable disputes as to any of the essential elements of a private securities fraud action. Importantly, the record contains no evidence of the requisite reliance on any public conduct or statements made by Cady – whether innocent or instead, misleading, manipulative,

deceptive, or otherwise fraudulent. The record does not establish that the Plaintiff Funds knew about or otherwise relied on anything said or done by Cady at the time that they purchased or sold DVI's securities. Moreover, the record shows that none of the deceptive acts and misstatements alleged in the Complaint was was ever publicly made by or attributed to Cady.

Reliance may not be presumed here. In a related private securities action that involved Clifford Chance's role as DVI's legal counsel,[11] our Court of Appeals ruled that Plaintiffs

> cannot invoke the fraud-on-the-market presumption of reliance in a private action under Rule 10b-5(a) and (c) unless the deceptive conduct has been publicly disclosed and attributed to the actor. . . . [B]ecause plaintiffs do not contend Clifford Chance's alleged role in masterminding the fraudulent 10-Q was disclosed to the public, they cannot invoke the presumption.

In re DVI, Inc. Sec. Litig., 639 F.3d 623, 649 (3d Cir. 2011), abrogated on other grounds, 133 S. Ct. 1184 (U.S. 2013). For largely the same reasons, the record here compels a similar conclusion as to Cady's position and conduct as the CEO, President, and a Director DVI BC. Plaintiffs have not shown that the allegedly deceptive conduct was publicly disclosed and attributed to Cady: "It is insufficient to show only that the deceptive conduct was publicly disclosed through other statements or conduct; the public must be made aware of the defendant's acts." DVI, 639 F.3d at 648 (citations and internal quotation marks omitted); see also Stoneridge, 552 U.S. at 160 (rejecting the argument that "investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect").

---

[11] See In re DVI, Inc. Sec. Litig., No. 03-5336, 2013 WL 56073 (E.D. Pa. Jan. 4, 2013), granting summary judgment in favor of Defendants Clifford Chance LLP and Clifford Chance U.S. LLP and against Plaintiffs as to all Section 10(b) claims contained in the Complaint. (Jan. 4, 2013 Order & Mem., Doc. Nos. 847, 848). In part, it was ruled that Janus and Stoneridge as well as rulings by our Court of Appeals in DVI, 639 F.3d 623 (3d Cir. 2011) controlled the outcome – "Plaintiff investors have not produced any evidence of individualized reliance" and therefore, "Clifford Chance cannot be held liable for assisting in the alleged deceptive scheme or for making any mis-statements in DVI's public filings." Id., 2013 WL 56073 at *5, 8.

On this record, Cady's position at DVI BC, and the degree of his involvement in day-to-day operations of DVI, DVI BC, or DVI FS, is immaterial:

> Stoneridge . . . did not create a remoteness test for private causes of action. The fact that the vendors' conduct was "not disclosed to the investing public," id., is what made it too remote to invoke the presumption of reliance.

DVI, 639 F.3d at 646-47 (quoting Stoneridge, 552 U.S. at 161; footnote omitted); see also id. & n.32 (invocation of the fraud-on-the-market presumption of reliance as to Clifford Chance precluded because "we cannot materially distinguish the facts in this case from those in Stoneridge"). See also Pugh v. Tribune Co., 521 F.3d 686, 696-87 (7th Cir. 2008) (private cause of action not stated where executive had no role in preparing or disseminating the company's financial statements or press releases, and it was not alleged that the company's investors were informed of his false certification).

Plaintiffs suggest that Cady, as one of the group of individual Defendants, owed investors a "duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition, operating performance, and prospects." Compl. ¶¶ 43, 238 (asserting that the individual Defendants, including Cady, had a "duty to prevent the wrongful conduct alleged"). Perhaps this is an invocation of a rebuttable presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972), although no argument or evidence is provided. This presumption of reliance "is generally applicable only when material information is withheld from investors by a defendant having an affirmative duty of disclosure." DVI, 639 F.3d at 631 n.10 (citing Affiliated Ute, 406 U.S. at 153-54); Stoneridge, 552 U.S. at 159); see also id. at 643 n.30 (discussing the unsuccessful assertion of such a duty to disclose as to Clifford Chance).

If so proposed, such a duty to disclose would be without merit. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." <u>Basic, Inc.</u>, 485 U.S. at 239 n.17. Generally, "an affirmative duty arises only when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." <u>Winer Family Trust v. Queen</u>, 503 F.3d 319, 329 (3d Cir. 2007) (citing <u>Oran v. Stafford</u>, 226 F.3d 275, 285-86 (3d Cir. 2000)). <u>See also In re DVI Inc. Sec. Litig.</u>, 249 F.R.D. 196, 218 (E.D. Pa. 2008) (Davis, J.) ("<u>Affiliated Ute</u> presumption is equally inapplicable because Clifford Chance owed no duty of disclosure to DVI's investors") (citing <u>Stoneridge</u>, 552 U.S. at 159), <u>aff'd</u>, 639 F.3d at 629, 643 n.30 (3d Cir. 2011)). As to Cady, no affirmative duty to disclose was ever pled. No applicable statute or case law is cited to support a finding that Cady, individually, owed a duty to disclose information to investors. On this record, Cady had no duty to disclose.

Moreover, the Plaintiff Funds have not submitted evidence of specific reliance on Cady's statements or conduct. Each Plaintiff must prove "reliance on a fraudulent material misrepresentation or omission," <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 174 (3d Cir. 2001), and reliance on the defendant's publicly disclosed, deceptive acts, <u>Stoneridge</u>, 552 U.S. at 159, 160-64. This includes proof that each was "aware of, and directly misled by, an alleged misrepresentation," <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 178 (3d Cir. 2000), and that such statement or conduct caused each "to engage in the transaction in question," <u>Newton</u>, 259 F.3d at 174 (citations and internal quotation marks omitted). This Plaintiffs have not done.

In addition to the requisite proof of reliance, Cady's motion for summary judgment correctly asserts that the record does not contain evidence creating triable disputes as to other elements of a Section 10(b) claim – manipulative or deceptive conduct and scienter.  Def. Br., Doc. No. 260 at 15; Def. Reply Br., Doc. No 282 at 5.  This memorandum agrees.

As to the scope of conduct actionable under Section 10(b), the statute prohibits "manipulative or deceptive" acts in connection with the purchase or sale of securities.  15 U.S.C. § 78j(b), see Central Bank, 511 U.S. at173 ("'[t]he words 'manipulative or deceptive' . . . strongly suggest that [Section] 10(b) was intended to proscribe knowing or intentional conduct'") (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976)).  "Use of the word 'manipulative' . . . connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities" Ernst & Ernst, 425 U.S. at 199.

Here, Plaintiffs sue for acts not prohibited by the text of the statute – Cady's participation in the inter-company transfers.  They say that Cady engaged in manipulative and deceptive "round-trip financing" of various loan agreements.  By doing so, they also say, Cady participated, as a decision-maker, in understating DVI's loan loss reserves.  These activities are said to have been part of DVI's alleged fraudulent scheme to deceive the investing public as to the true financial condition of DVI and artificially inflate the market price of DVI's securities.  See Pls. Br., Doc. No. 275 at 7-8.  However, the evidence shows only that funds were transferred between the two subsidiaries for business reasons that are not actionable as fraud.  See, e.g., Oct. 3, 2008 Epstein Report at 60, Def. Ex. 9, Doc. No. 260-11 at 3 ("this is not prohibited").  Cady, Boyle, and Garfinkel all testified that there were business decisions for the transfers – none of which is

proscribed – and this has not been controverted by admissible evidence. Plaintiffs have not

provided any authority or evidence that would warrant treating the inter-company transfers as

anything other than permitted business practices – whether prudent or not prudent. On this

record, the transfers involve conduct that is outside the scope of Section 10(b)'s prohibition.

Moreover, the record does not contain any evidence suggesting that the transfers

themselves misled or deceived investors. According to Plaintiffs, they did not know about "the

massive fraudulent scheme" at DVI until April 7, 2004 – the date DVI's court appointed

bankruptcy examiner issued his report. Pls. Br., Doc. No. 275 at 3. Also, the investing public

could not have learned about the transfers from reading DVI's financial statements. DVI did not

prepare separate financial statements for its two subsidiaries. Instead, DVI filed consolidated

financial statements that did not itemize its subsidiaries' inter-company transfers. Mar. 25, 2008

Steven Garfinkel Dep., 231:9-22, Def. Ex. 6, Doc., No. 260-7 at 7; Def. Cady's SOF ¶¶ 16, 22.

In Plaintiffs' view, the "thrust of this activity was to make it appear that DVI FS loans

were performing when in fact they were in default," and "[t]his was intended to and did result in

artificially reducing the allowance for loan losses on DVI's financial statements." Pls. Br., Doc.

No. 275 at 7. Also they say: "Cady participated in creating the illusion that loans were current,

even though the borrowers had no ability to repay these re-written loans." Id. But as to Cady,

these assertions are not supported by evidence. They arise, apparently, from inferences,

suppositions, and hypotheses drawn from the Examiner's reported findings as to DVI's

mismanagement and missstatements. Yet no evidence has been provided showing that Cady,

individually, improperly restructured or advanced funds on any specific loans at any time. No

evidence has been provided showing that loans were in default or borrowers could not repay their

loans.  Moreover, even assuming DVI fraudulently reported the value of rewritten and delinquent

or defaulted loans in its public filings, that would not prove that Cady acted to defraud investors.

Plaintiffs say that Cady "caused" DVI FS to rewrite loans requiring repayments on

outstanding loans by DVI BC.  See Pls. Br., Doc. No. 275 at 7, citing Cady's testimony.  But the

evidence cited does not support this assertion.  Cady testified:  "I know that DVI FS refinanced

assets, and out of the proceeds of some of those, they repaid DVI BC debt, yes."  Jan. 23, 2008

Cady Dep., 538:1-23, McEvilly Decl., Ex. 1, Doc. No. 277-1 at 14-15.

Plaintiffs say that Cady was "integral to a scheme to understate DVI, Inc.'s allowance for

loan losses" and was "one of the decision makers of DVI, Inc. on establishing the loan loss

allowance."  Pls. Br., Doc. No. 275 at 8, citing Cady's testimony.  Again, this distorts the record.

Cady testified that his role in setting loan loss reserves was one of preparing documentation and

making recommendations to his superiors.  2008 Cady Dep., 243:8-244:1, McEvilly Decl., Ex. 1,

Doc. No. 277-1 at 10-11.  As to who was the "ultimate decider as to whether or not to take a loan

loss reserve," Cady testified that it was O'Hanlon.  Jan. 23, 2008 Cady Dep., 244:7-10, 18-23,

McEvilly Decl., Ex. 1, Doc. No. 277-1 at 11.  The record shows that O'Hanlon and other DVI

senior executives made the decisions on setting and reporting loan loss reserves.  No evidence

has been provided showing that Cady was substantially involved in setting loan loss reserves or

that he understated any of the loan loss recommendations that he made.

Proof of the defendant's scienter is required in a private securities fraud action.  Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) ("a private plaintiff must prove

that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or

defraud'") (quoting Ernst & Ernst, 425 U.S. at 193-94)); accord Belmont v. MB Inv. Partners,

Inc., 708 F.3d 470, 493 (3d Cir. 2013); In re Ikon Office Solutions, Inc., 277 F.3d 658, 667 (3d Cir. 2002) ("or, at a minimum, highly unreasonable conduct, involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.") (alterations, citations, and internal quotation marks omitted). Tellabs explains that there must be a "strong inference" of scienter – *i.e.*, a powerful or cogent" inference based on the entire record, and "plausible opposing inferences" must be taken into account. 551 U.S. 322-24.

Plaintiffs have adduced no such proof. On this record, no reasonable fact finder would view the inference of scienter as compelling or convincing. Plaintiff's only evidence of scienter is Cady's position at DVI BC – buttressed by the supposition that given the degree of his involvement in day-to-day operations of DVI, DVI BC, or DVI FS, he must have known of the fraudulent scheme allegedly carried out at DVI. This is not enough. See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 279 (3d Cir. 2006) ("fraud by title" not enough – facts as to the specific knowledge and conduct of each defendant corporate officer was required); Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 413 (S.D.N.Y. 2007) (allegations that defendant officers should have known about corporation's financial state based solely on their executive positions was not enough to plead fraud).

The record suggests that Cady had an honest belief that the inter-company transfers were legitimate business practices. And the record does not contain any admissible evidence that might serve as a basis to controvert his stated beliefs. Moreover, an inference of scienter cannot be based on the inter-company transfers themselves or Cady's limited involvement with loan loss

reserves. On this record, the transfers themselves and Cady's conduct in regard to them were not intentionally dishonest, deceptive, or otherwise fraudulent. Similarly, an inference of scienter cannot be based on his job title and duties alone. The record does not contain any facts about Cady's duties, activities, and transactions for any of DVI BC, DVI FS, or DVI suggesting that he was aware of the alleged fraud. Plaintiffs's argument only assumes that the alleged fraud was so obvious that Cady must have or should have known about it. The posited inferences are unsupported speculation that Cady acted with the requisite culpable mental state.

B.     Section 20(a) Claims

"Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)." In re Suprema Specialties, 438 F.3d at 284 ("plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws"). Here, it is alleged that Cady controlled DVI, and DVI committed a primary violation of the securities laws. However, the record is devoid of any evidence that he did so.

As previously ruled in a related securities action, Plaintiffs have the burden of demonstrating that Cady was a control person within the meaning of Section 20(a), including proof of an essential element – that he "had actual power or influence over the allegedly controlled person," DVI. In re DVI, Inc. Sec. Litig., No. 03-5336, 2005 WL 1307959, at *12 (E.D. Pa. May 31, 2005) (citing In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998)); accord id., No. 03-5336, 2013 WL 247149, at *9-10 (E.D. Pa. Jan. 23, 2013). See 17 C.F.R. § 240.12b-2 ("The term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether

through ownership of voting securities, by contract or otherwise.").  As to Cady, the allegations contained in the Complaint are not enough to meet this standard.  Nor do those allegations discharge Plaintiffs' burden as the non-moving party to this summary judgment proceeding.

In fact, the record suggests that even as to the management of DVI BC, Cady did not fully exercise actual power and influence over the management of significant numbers of large-dollar delinquent loans.  Instead, O'Hanlon exercised the ultimate decision-making authority on those loans, and Miller largely exercised day-to-day control over the inter-company transfers of funds between DVI FS and DVI BC.  The evidence shows that Cady was involved in recommending some loan loss allowances, but he was not involved in setting or reporting those reserves for purposes of DVI's financial statements.

Importantly, the record contains no evidence that Cady culpably participated in the fraud that allegedly occurred at DVI.  The record shows that Cady believed – in apparent good faith – that there were legitimate business reasons for the challenged loan transactions.  However, there is no need to decide the question as to his good faith under Section 20(a).  This is so because the record does not contain any threshold evidence of Cady's actual control of DVI, the alleged violator of the securities laws, Section 10(b).

IV.     CONCLUSION

Absent any evidence showing that Cady publicly made any false, misleading, or otherwise fraudulent statements or omissions, or engaged in any manipulative or deceptive conduct that was communicated to the investing public or specifically to the Plaintiff Funds, the record fails to establish triable disputes as to essential elements of this private securities fraud action – a material misrepresentation or omission, manipulative or deceptive conduct, reliance,

and scienter.  Given this lack of evidence, proof of loss causation and actual damages would fail as well.  Cady cannot be held liable under Section 10(b) or Rule 10b-5.  Also, liability cannot be imposed upon him under Section 20(a) as a person who controlled DVI, the alleged violator of the securities laws, Section 10(b).

An Order accompanies this Memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.