IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WM HIGH YIELD FUND, et al.       :        CIVIL ACTION
                                    :
             v.                   :
                                    :
MICHAEL A. O'HANLON, et al.       :        No. 04-3423

MEMORANDUM

Legrome D. Davis, J.                                         June 27, 2013

Plaintiffs – six institutional Funds[1] that invested in debt securities issued by Diagnostic

Ventures, Inc. (DVI) – sue for violations of Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5. As to Defendant Deloitte &

Touche LLP, they also seek imposition of liability under Section 18 of the Exchange Act, 15

U.S.C. § 78r, and Pennsylvania's common law of fraud.[2] Jurisdiction is the Exchange Act, 15

U.S.C. § 78aa; federal question, 28 U.S.C. § 1331; and supplemental over the state law claims,

28 U.S.C. § 1367.

---

[1] The Plaintiff Funds are WM High Yield Fund; WM Income Fund; WM VT Income Fund; AT High Yield Fund; AT Income Fund; and Stellar Funding, Ltd.

[2] For the history and factual background of this action see WM High Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446 (E.D. Pa. May 13, 2005) (Apr. 29, 2005 Order and May 13, 2005 Amended Mem., Doc. Nos. 108, 112; and Feb. 23, 2006 Order, Doc. No. 165).
    On November 1, 2004, Deloitte & Touche LLP and Harold Neas jointly moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Defs. Mot, Doc. No. 53. As to Neas, the Court dismissed all claims except those asserting liability under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count I). WM High Yield Fund, 2005 WL 6788446, at *6-8, 18. As to Deloitte, the Court dismissed all claims except those asserting liability under Section 10(b) and Rule 10b-5 (Count I); Section 18 of the Exchange Act, 15 U.S.C. § 78r (Count III); and Pennsylvania's common law of fraud (Count IV). Id., 2005 WL 6788446, at *6-8, 11-13, 18.
    On May 12, 2005, Deloitte and Neas, among other Defendants, jointly moved for reconsideration or, in the alternative, certification for appeal of the April 29, 2005 dismissal decision. Defs. Mot., Doc. No. 110. Defendants also moved for reconsideration and clarification of that decision. Defs. Mot., Doc. No. 111. As to the reconsideration requested, the Court denied the motion for certification for appeal. Feb. 23, 2006 Order, Doc. No. 165. Also, the Court denied in part, and granted in part, the motion for clarification. Id. It was ruled that to the extent that Plaintiffs sought to hold Deloitte and Neas, among other Defendants, "liable as 'secondary' violators" under Section 10(b), those claims were dismissed. Id.; see also WM High Yield Fund, 2005 WL 6788446, at *7 (ruling that Cent. Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164 (1994) precluded "secondary" or "aiding and abetting" liability).

Defendant Deloitte & Touche LLP – DVI's former independent auditor – and Defendant Harold Neas who was a partner at Deloitte, jointly move for summary judgment (Doc. No. 262). Fed. R. Civ. P. 56. The motion asserts that the record[3] is devoid of evidence to establish essential elements of a private securities action [4] – loss causation and actual damages.[5] Proof of both, it is asserted, requires expert opinion. But Plaintiffs have not proffered expert opinion on either topic.[6]

Defendants' position is that under Dura Pharm., Inc v. Broudo, 544 U.S. 336 (2005), and precedent by our Court of Appeals for private securities actions, the record does not establish triable disputes as to the fraud alleged against them. It is asserted that Plaintiffs "have not identified a single public disclosure correcting any alleged misstatement or omission" by either Deloitte or Neas. Defs. Br. at 1, 4-5, Doc. No. 263; Defs. Supp. Br., Doc. No. 305 at 1-2. It is

---

[3] Both sides submitted proposed undisputed facts, and Plaintiffs' submission responded specifically to the facts stated by Defendants, disputing and objecting to many. Defs. Statement of Facts (SOF), Doc. No. 264; Pls. Counter-Statement of Facts (CSOF), Doc. No. 267. Those responses do not present any genuine disputes material to a decision on the motion for summary judgment presented here.

[4] For a Section 10(b) private action, the essential elements are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; amd (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008); accord Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 n.3 (U.S. 2011).

[5] In essence, "loss causation" means "a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)); accord McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424-25 (3d Cir. 2007) ("the fraudulent misrepresentation or omission actually caused the economic loss suffered"); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 173 (3d Cir. 2001) ("Loss causation demonstrates that the fraudulent misrepresentation actually caused the loss suffered.").

[6] Discovery – including expert disclosures and depositions – closed more than four years ago on March 2, 2009 (Aug. 27, 2008 Order, Doc. No. 250). At the time the instant motion for summary judgment was filed on April 30, 2009, Plaintiffs had not produced an expert report on the topics of loss causation or damages. Nor did they do so thereafter. They do not genuinely dispute otherwise. Defs. SOF & Pls. CSOF, ¶¶ 20, 25.

also asserted that Plaintiffs have not ascribed any proportion of the overall claimed damages to a misrepresentation or omission by either Deloitte or Neas. This lack of proof, it is contended, defeats the Section 10(b) and Rule 10b-5(a), (b), and (c)[7] claims contained in Count I of the Complaint against Deloitte and Neas as well as the Section 18 claims contained in Count III[8] and the common law fraud claims contained in Count IV of the Complaint against Deloitte.

Plaintiffs oppose summary judgment, asserting that Deloitte, at the direction of Neas, "falsely represented to investors as fact that its audits of DVI's financial statements were performed in accordance with Generally Accepted Auditing Standards (GAAS) and that DVI's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles (GAAP), which falsely reassured investors as to their accuracy." Pls. Br., Doc. No. 266 at 4. It is averred that they "read and relied on the financial information" contained in DVI's Form 10-K filings with the Securities and Exchange Commission (SEC), including Deloitte's unqualified audit opinions, which were "false and misleading."[9] Compl. ¶¶ 305-308. In their view, there is "ample evidence" creating triable disputes as to both loss causation and damages. Pls. Supp. Br., Doc. No. 313 at 8.

---

[7] Subsections (a) and (c) of Rule 10b-5, respectively, make it unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud." 17 C.F.R. § 240.10b-5(a), (c). Subsection (b) of Rule 10b-5 prohibits "mak[ing] any untrue statement of material fact" or omitting a material fact necessary to clarify prior misleading statements. 17 C.F.R. § 240.10b-5(b). "We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements." In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011), abrogated on other grounds, 133 S. Ct. 1184 (U.S. 2013).

[8] "Section 18 creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act . . . ." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 283 (3d Cir. 2006); Section 18 of the Exchange Act, 15 U.S.C. § 78r(a) (in part, a plaintiff must show that it "purchased or sold a security at a price which was affected by such [false or misleading] statement").

[9] See generally United States v. Arthur Young & Co., 465 U.S. 805, 810-11, 818-19 & nn.13, 14 (1984) (explaining the role of an independent auditor, as required by the Securities and Exchange Commission's (SEC) regulations, and the meaning of an auditor's unqualified opinion in the marketplace).

Plaintiffs disclaim any requirement for expert evidence "where, as here, there is an 'obvious causal relationship' between the evidence and the alleged damages." Pls. Supp. Br., Doc. No. 313 at 7-8 (citation and internal quotation marks omitted). "There is no doubt," they say, a "pervasive," "massive fraudulent scheme at DVI" produced DVI's fraudulent financial statements and Deloitte's fraudulent audit certifications of those financial statements. Pls. Br., Doc. No. 266 at 2-4. In their view, they were damaged when they purchased and retained DVI's artificially inflated securities – $9^{7/8}$ percent "Senior Notes": "No market for the bonds would have existed absent the materially false and misleading statements and omissions resulting from defendants' massive fraudulent scheme at DVI." Id. at 2, 3. And the "result of this fraud" was DVI's eventual financial collapse, bankruptcy, and liquidation, which "wiped out the value" of DVI's securities. Id. at 2, 7. Plaintiffs sue for the principal amount they paid for DVI's securities and lost interest.

Plaintiffs' initial opposition to summary judgment, as filed on July 1, 2009, contended that they had no reason to inquire about the soundness of DVI's financial statements before July 19, 2003. Pls. Br., Doc. No. 266 at 9; Pls. Counter-Statement of Facts (CSOF) ¶ 6, Doc. No. 267; Compl. ¶ 286. In their view, DVI's "true dire financial condition" was not exposed until August 14, 2003, when the New York Stock Exchange (NYSE) suspended trading of DVI's securities. Pls. Br., Doc. No. 266 at 3, 6-7. On August 25, 2003, DVI filed for Chapter 11 bankruptcy protection. According to Plaintiffs, "the massive fraudulent scheme" at DVI was not revealed to investors until April 7, 2004 – the date DVI's court-appointed bankruptcy examiner issued his report. Id. at 7, 9.

As to accounting and auditing improprieties, Plaintiffs' initial position was that there were no disclosures correcting the market price for DVI's securites before the examiner issued

his report and the Senior Notes were "trading in bankruptcy for pennies on the dollar."  Pls. Br., Doc. No. 266 at 6, 7-9.  In their view, DVI's rapid collapse into bankruptcy liquidation removed any requirement to prove loss causation by showing that the price of the securities declined in response to a disclosure revealing the truth about an allegedly fraudulent statement or omission by Deloitte or Neas.  Id. at 8.  In response to Deloitte's and Neas' interrogatories, Plaintiffs identified two disclosures they found pertinent to the fraud alleged against Deloitte and Neas  – a September 26, 2003 DVI press release and the April 7, 2004 bankruptcy examiner's report.  But Plaintiffs did not press a corrective disclosure theory of loss causation.

Instead, loss causation was grounded on the "materialization of risk" theory as set forth in Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172-73 (2d Cir. 2005) and its progeny.  See, e.g., Pls. Br., Doc. No. 266 at 8 ("need only show that the loss was caused by some fact concealed by the fraud that ultimately caused the loss.").  Recently, Plaintiffs reasserted this theory as the primary ground for a ruling in their favor.  Pls. Supp. Br., Doc. No. 313 at 5 & n.1 (also eschewing the "true financial condition" theory of loss causation).[10]

Plaintiffs' supplementary opposition to summary judgment, as filed on April 25, 2013, newly presents another position on loss causastion.  Additional disclosures are now identified – "the revelations of August 6, 2003 to August 14, 2003" as discussed by this Court in a related

---

[10]  Plaintiffs have abandoned the "true financial condition" theory.  After briefing closed on the instant motion for summary judgment, it was ruled in a related securities class action that "this approach has been rejected by many courts, including in this circuit, as it fails to connect the corrective disclosure to the alleged misrepresentation or omission. . . . This Court agrees and will not apply a standard that is so lax that every announcement of negative news becomes a potential corrective disclosure."  In re DVI, Inc. Sec. Litig., No. 03-5336, 2010 WL 3522090, at *6 n.11 (E.D. Pa. Sept. 3, 2010) (citation and internal quotation marks omitted) (following In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 687-90 (E.D. Pa. 2001) (granting summary judgment because there was no evidence that misstatements caused the loss, rather than exposure of the 'grim reality" of the company's financial situation)).

securities class action that also named Deloitte as a defendant – In re DVI, Inc. Sec. Litig., No.

03-5336, 2010 WL 3522090, at *22-23 (E.D. Pa. Sept. 3, 2010). Pls. Supp. Br., Doc. No. 313 at

10. That decision denied Deloitte's motion for summary judgment, ruling that triable disputes

existed as to whether certain partial disclosures identified by the plaintiffs' expert "revealed the

truth about Defendant [Deloitte's] alleged misstatements as to DVI's financial statements." Id.,

2010 WL 3522090, at *23. Plaintiffs assert that under principles of collateral estoppel, those

rulings in DVI should be applied here to bar summary judgment in Deloitte's favor. Pls. Supp.

Br., Doc. No. 313 at 9-12, 9 (suggesting that triable disputes as to disclosures identified in DVI

are comparable to allegations set forth here in the Complaint ¶¶ 7-10, 197-203).[11]

---

[11] Many years after the close of discovery and briefing on this motion for summary judgment, Plaintiffs present this new matter beyond the scope of the February 26, 2013 Order (Doc. No. 304). That Order permitted the parties to supplement their moving papers with concise briefing on significant rulings recently issued by the Supreme Court, our Court of Appeals, and this Court. As permitted, Defendants Deloitte and Neas filed a supplemental reply to this issue. May 6, 2013 Order, Doc. No. 316; Defs. Supp. Reply Br. & Exhibits, Doc. Nos. 315, 317. Further consideration of the newly proposed corrective disclosures – which were not identified before in discovery – would unfairly prejudice these Defendants.

In addition, Plaintiffs' position is not sound. Collateral estoppel applies "only if: '(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment.'" Anderson v. IRS, 698 F.3d 160, 164 (3d Cir. 2012) (quoting In re Graham, 973 F.2d 1089, 1097 (3d Cir. 1992) (citations and alterations omitted)). In DVI, 2010 WL 3522090, at *22-23, the rulings that triable disputes exist as to certain disclosures were based on the more fully developed record in that case– including expert reports submitted by both sides. Those rulings finally decided only that a trial on genuinely disputed factual issues was necessary. They cannot be excised from the record in DVI and imported wholesale into this case – the alleged misrepresentations, the disclosures at issue, and the methods of calculating damages are not the same as those presented here. See Hawksbill Sea Turtle v. FEMA, 126 F.3d 461, 474 n.11 (3d Cir. 1997) (no need to decide whether findings in the prior action were sufficiently "firm" to merit application of collateral estoppel because the issues presented were not identical to those decided in the prior action). See also Defs. Supp. Reply Br., Doc. No. 317 at 4-5 (detailing the differences between DVI as compared to the present case). Moreover, Neas was not a party to DVI. And he was not fully heard on any issues and none was decided adversely to him in that case.

Trial courts are granted "broad discretion" to determine when collateral estoppel should be applied. Parkland Hosiery Co. v. Shore, 439 U.S. 322, 651(1979). In cases where a plaintiff could easily have joined in the earlier action, such as this one where Plaintiffs opted out of DVI to pursue a separate action, "application of offensive collateral estoppel would be unfair to a defendant." Parkland, 439 U.S. at 326 & n.4, 651-52 (noting that offensive use of collateral estoppel likely increases rather decreases the total amount of litigation because "potential plaintiffs have everything to gain and nothing to lose by not intervening in the first action").

The primary question presented here is whether the record contains sufficient evidence showing that a fraudulent misrepresentation or omission by either Deloitte or Neas proximately caused actual economic losses as alleged by Plaintiffs. The motion for summary judgment will be granted. Plaintiffs have not adduced that quantum of evidence on the issues of loss causation and damages required to withstand summary judgment on any of the asserted theories of liability.

I.      PROCEDURAL AND FACTUAL BACKGROUND

The Complaint, as filed on July 19, 2004, avers that during August 10, 1999 through August 13, 2003, Plaintiffs invested in DVI's bonds that traded on the NYSE – $9^{7/8}$ percent Senior Notes, which had been issued in 1997 and 1998, and were due on February 1, 2004. Compl. ¶¶ 1, 285. During that four-year period, it is averred that Deloitte and Neas, individually and together with other DVI officers, directors, and business entities "engaged in a scheme to falsify DVI's financial results and overstate its earnings by at least $120 million." Id. This was done to "deceive . . . the investing public as to the true financial condition of DVI," and "artificially inflate and maintain the market price of DVI's securities"[12] – all in violation of Section 10(b) and Rule 10b-5(a), (b), and (c). Id. ¶¶ 6, 277-279, 291-299 (Count I); see also id. ¶¶ 304-314 (Count III, Section 18); id. ¶¶ 315-322 (Count IV, common law fraud).

In regard to movants here, the gravamen of the Complaint avers that for fiscal years ended June 30, 1999 through June 30, 2002, "Deloitte, at the direction of Neas, issued

_____

[12] The Complaint invokes a presumption of reliance on "the integrity of the market price of the Senior Notes." Compl. ¶¶ 285, 290, 297. Under the "fraud-on-the-market doctrine, a plaintiff investor that buys or sells a publicly-traded security may be granted a rebuttable presumption of reliance on the integrity of the market price for that security. Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988). Most publicly available information is reflected in the security's market price. Id. When statements or conduct become public, "[t]hen it can be assumed that an investor who buys or sells stock at the market price relies upon the statement [or conduct]." Stoneridge, 552 U.S. at 159 (citing Basic, 485 U.S. at 247).

unqualified audit opinions on DVI's annual financial statements . . . stating that Deloitte's audits were conducted in accordance with GAAS and that, in Deloitte's opinion, DVI's financial statements 'present[ed] fairly, in all material respects' DVI's and its subsidiaries' financial position, results of operations, and cash flows for those fiscal years in accordance with GAAP." Compl. ¶ 249; see also id. ¶¶ 5, 47-49, 107, 113, 127, 129, 139, 141, 166, 168. It is averred that Deloitte's audit opinions "were materially false and misleading . . . and an extreme departure from GAAS." Id. ¶¶ 1, 249, 277-279, 297. And the manner in which DVI reported its financial results as part of its annual Form 10-K filings "represented an extreme departure from GAAP." Id. ¶¶ 249, 248-279 (detailing alleged auditing and accounting deficiencies). Plaintiffs: "Without these materially false and misleading unqualified audit opinions, the fraud could not have been perpetuated." Id. ¶ 279.

For fiscal years ended June 30, 1999 through June 30, 2002, each of the audit opinions was signed "Deloitte & Touche LLP." See Deloitte's audit opinions, Defs. Statement of Facts (SOF) ¶ 3, Ex. B, Doc. No. 264.[13] Neas' signature and name do not appear on the audit opinions.

---

[13] For fiscal years ended June 30, 1999 through June 30, 2002, each of the audit opinions contained the following language:

> We have audited the accompanying consolidated balance sheets of DVI, Inc. and its subsidiaries (the "Company') as of June 30, [1999, 2000, 2001, 2002] and the related consolidated statements of operations, shareholders' equity and cash flows for each of the three years in the period ended June 30, [1999, 2000, 2001, 2002]. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with auditing standards generally accepted in the United States of America" [1999 audit opinion: "in accordance with generally accepted auditing standards"]. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes [cont'd . . .]

It is averred that the collective fraud of all named defendants "caus[ed] damages to Plaintiffs when they purchased these securities at inflated prices and retained their investments in reliance on defendants' false and misleading statements."  Compl. ¶¶ 12, 296-297, 299 ("As a direct and proximate cause of the defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases and sales of the Senior Notes.").

As described in the Complaint, the "market price of the Senior Notes declined materially upon the public disclosure of the true facts which had been misrepresented or concealed."  Compl. ¶¶ 46, 298.  On June 2, 2003, Deloitte resigned as DVI's auditor, and on June 4, 2003, its resignation was announced to the investing public.  Id. ¶ 183.  At that time, the Senior Notes traded on the NYSE at "94.00, down from 98.50 at the end of May 2003."  Id.; see also  "DVI Bond Price History," Declaration of Plaintiffs' Counsel, James P. McEvilly, III, Ex. 9 (traded at $98.12).  On August 1, 2003, DVI revealed that it would not be able to make interest payments on the Senior Notes.  Compl. ¶¶ 7, 191.  On August 13, 2003, DVI disclosed its intention to file for Chapter 11 bankruptcy protection.  Id. ¶¶ 8, 197.  On August 13-15, 2003, the Senior Notes dropped in value to $32.50, and the NYSE suspended trading of DVI's securities and delisted

---

assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of DVI, Inc. and its subsidiaries as of June 30, [1999, 2000, 2001, 2002], and the results [1999 audit opinion: "consolidated results"] of their operations and their cash flows for each of the three years in the period ended June 30, [1999, 2000, 2001, 2002] in conformity with accounting principles generally accepted in the United States of America [1999 audit opinion: "in conformity with generally accepted accounting principles"].

Defs. SOF ¶ 3, Audit Opinions, Ex. B.

DVI.  Id. ¶¶ 9, 198-199; see also McEvilly Decl., Ex. 9 (traded at $32.00).  On August 25, 2003,

DVI filed for Chapter 11 bankruptcy protection and began liquidating its assets.  Id. ¶¶ 10, 200.

Thereafter, the Senior Notes were "worth pennies on the dollar."  Id.  See also Pls. Br., Doc. No.

266 at 6 (DVI "plummeted into bankruptcy and liquidation" within two months of Deloitte's

resignation, and the price of the Senior Notes dropped from $98.12 to "pennies on the dollar").

## II.    SUMMARY JUDGMENT FINDINGS OF UNDISPUTED MATERIAL FACT

1.      The Complaint does not contain any averments that Neas made any public

statements or signed any documents that affected the market price for DVI's securities.

2.      The record does not contain any evidence that Neas made a statement about DVI –

at any time, to anybody – and none of the allegedly false and misleading statements averred in

the Complaint was ever publicly attributed to Neas.  See Compl. ¶¶ 104-181 (alleged

misstatements).

3.      Deloitte signed and issued the audit opinions in question, certifying the soundness

of DVI's annual financial statements for fiscal years ended June 30, 1999 through June 30, 2002.

Neas' signature and name do not appear on the audit opinions.

4.      The record does not contain any evidence that Deloitte signed or otherwise made

any other audit opinions certifying DVI's financial statements, or made any other public

statements that affected the market price for DVI's securities.

5.      For fiscal year ended June 30, 2003, DVI signed and made the statements

contained in its Form 10-Q filings for the first three fiscal quarters (ended March 31, 2003).  And

the record does not contain any evidence that either Deloitte or Neas signed any audit opinions or

otherwise made any public statements certifying DVI's quarterly financial statements.

6.     Deloitte resigned as DVI's independent auditor effective June 2, 2003.

7.     Other than Deloitte's audit opinions certifying DVI's annual financial statements, which were contained in DVI's Form 10-K filings for fiscal years ended June 30, 1999 through June 30, 2002, none of the other allegedly false and misleading statements averred in the Complaint was ever publicly attributed to Deloitte.  See Compl. ¶¶ 104-181 (alleged misstatements).

8.     Gary Pokrzywinski, Fund Manager for WM Advisors – an investment advisor for each of the Plaintiff Funds – testified as Plaintiffs' Federal Rule of Civil Procedure 30(b)(6) designee.  Defs. SOF & Pls. CSOF, ¶ 4.

9.     Pokrzywinski, when asked to identify "the first time he believed there had been some inaccuracy in DVI's financial statements," testified "that would have been after – after the bankruptcy filing."  Pokrzywinski Dep., 331:3-8, Defs. SOF, Ex. C.  See Compl. ¶ 10 (DVI filed for Chapter 11 bankruptcy protection on August 25, 2003).

10.     Pokrzywinski testified that he believed DVI's financial statements were inaccurate because of communications he had with lawyers.  Pokrzywinski Dep., 331:9-332:24, Defs. SOF, Ex. C; Def. SOF ¶ 5.

11.     Pokrzywinski concluded that DVI's financial statements "weren't representative of what was going on" based on the April 7, 2004 report of the Chapter 11 Examiner, R. Todd Neilson, CPA, who had been appointed by the U.S. Bankruptcy Court for the District of Delaware to investigate the Debtor DVI's financial transactions, accounting practices, and alleged wrongdoing, among other topics.  Pokrzywinski Dep., 328:2-329:22, McEvilly Decl., Ex. 1; Pls. CSOF ¶ 5; see also Examiner's Report, McEvilly Decl., Ex. 3, Doc. Nos. 268-1 at 10 through 268-3 at 42.

12.     In discovery, Plaintiffs identified disclosures that allegedly "provided corrective information regarding DVI's true financial condition, which they contended contradict[ed] Deloitte's audit opinions and certifications that DVI's financial statements complied with GAAP." Pls' Responses to Defs. Interrogatory No. 11, Defs. SOF, Ex. E, incorporating by reference disclosures "as described" in the Complaint ¶¶ 182-187, 202.

13.     As incorporated by reference in answer to Defendants' Interrogatory No. 11, Plaintiffs identified only two disclosures occurring after July 19, 2003, which pertained to alleged misrepresentations or omissions made by Deloitte or Neas: DVI's September 26, 2003 press release and the April 7, 2004 Examiner's Report. Pls' Responses to Defs. Interrogatory No. 11, Defs. SOF, Ex. E; Defs. SOF ¶¶ 7, 8, 12; see Compl. ¶ 202 (press release mis-dated as Sept. 25, 2003); DVI's Sept. 26, 2003 press release, Defs. SOF, Ex. F; Examiner's Report, McEvilly Decl., Ex. 3. Plaintiffs acknowledge as much. Pls. CSOF ¶ 7.

14.     Plaintiffs acknowledge that prior to July 19, 2003, there were no disclosures that revealed materially false or misleading information in DVI's financial statements filed with the SEC, or otherwise corrected a misrepresentation or omission allegedly made by Deloitte or Neas. Plaintiffs:

> None of the disclosures prior to July 19, 2003 gave Plaintiffs enough information to know that they possessed a cause of action . . . . None . . . revealed, for certain, that the Company's prior SEC filings were materially false or misleading; rather they merely indicated that the Company was looking into whether there had been any misstatements. In addition, the disclosures revealed a difference of opinion between DVI and Deloitte regarding the nature and extent of the problems.

Pls. Omnibus Br. in Opposition to All Defs. Mots. to Dismiss the Compl. at 100-101, Doc. No. 63-1 at 47-48 (Pls. Omnibus Br. at 100-101, Defs. SOF ¶ 6, Ex. D).

15.     DVI's September 26, 2003 press release announced that "it expect[ed] a significant upward adjustment" of the loan loss reserves reported in its Form 10-Q for the quarter ended March 31, 2003; and during the two months prior to filing for bankruptcy on August 25, 2003, DVI may have misapplied funds "for working capital purposes."  Sept. 26, 2003 press release, Defs. SOF ¶ 8, Ex. F.

16.     DVI filed its Form 10-Q for the quarter ended March 31, 2003 on May 20, 2003. It did not contain an audit opinion, certification, or any other statement made by Deloitte or Neas. DVI's Form 10-Q for the quarter ended March 31, 2003, Defs. SOF ¶ 9, Ex. G; Pls. CSOF ¶ 9 (no corrective disclosures identified).

17.     DVI's September 26, 2003 press release identified a possible misuse of funds for working capital purposes "in the two months prior to its bankruptcy filing."  Deloitte resigned and withdrew as DVI's independent auditors effective June 2, 2003 – more than two months before DVI filed for bankruptcy protection on August 25, 2003, and before the referenced misuse of funds might have occurred.  Sept. 26, 2003 press release, Defs. SOF, Ex. F; Defs. SOF & Pls. CSOF, ¶ 11 (no genuine dispute).

18.     The April 7, 2004 Examiner's Report stated that no determination could be made as to whether Deloitte was negligent or breached any professional duties during its audits of DVI:

> Deloitte's actions (or inactions) may or may not have risen to the level of negligence or technically constituted breaches of its duties to DVI.  (The Examiner believes it premature to take a position on whether any claims or causes of action exist against Deloitte). Unquestionably, however, in the Examiner's opinion, Deloitte's conduct aggravated the circumstances surrounding and leading to DVI's present situation and the Examiner finds their actions to be inexplicably contradictory.

Examiner's Report, dated Apr. 7, 2004, at 177-178, McEvilly Decl., Ex. 3, Doc. No. 268-3 at 31-32; Defs. SOF ¶¶ 7-8, 12.

19.     Plaintiffs have not identified any portion of the Examiner's Report that corrected any specific misstatements or omissions allegedly made by Deloitte or Neas.

20.     The Examiner's Report did not correct any alleged misstatements or omissions in any of Deloitte's audit opinions certifying DVI's annual financial statements for the fiscal years ended June 30, 1999 through June 30, 2002.  Defs. SOF & Pls. CSOF, ¶ 13.

21.     Plaintiffs have not identified any specific line-item entry, computation, or portion of DVI's annual financial statements for DVI's fiscal years ended June 30, 1999 through June 30, 2002 that allegedly makes Deloitte's unqualified audit opinions materially inaccurate, incomplete, false, misleading, or deceptive.  See Pls. CSOF ¶ 13 (disclaiming any requirement to do so because a "stunning and pervasive pattern and practice of fraud" at DVI rendered "all" of its financial statements "materially misstated and false," and "[b]y definition," "rendered Deloitte's unqualified audit opinions false").

22.     Plaintiffs have not identified a single public disclosure correcting an alleged misstatement or omission by either Deloitte or Neas.

23.     In discovery, Deloitte and Neas served Interrogatory No. 6 requesting that Plaintiffs:

> Describe each item of damages that you claim in the lawsuit, including the complete factual basis for each item of damages, and an explanation of how you computed each item of damages, including any mathematical formula used.

In part, Plaintiffs answered Interrogatory No. 6:

> Exhibit "A," attached hereto, reflects all of their transactions in DVI Notes that are the subject of this lawsuit during the Relevant Time Period.  Plaintiffs further state

> that the damages they have suffered and for which they seek recovery . . . include the
> loss of principal and interest on their investments . . . .

Pls. Responses to Defs. Interrogatory No. 6, Defs. SOF, Ex. E; Defs. SOF ¶¶ 15, 16. See also

Pls. CSOF ¶ 16 (Plaintiffs "seek to recover . . . loss of principal and interest on their

investments"); Id. ¶ 18 ("losses are reflected in the trading activity with respect to DVI Bonds

purchased" by Plaintiffs).

24.     When asked at deposition, "How much have you lost in DVI bonds?"

Pokrzywinski testified:  "somewhere approaching $20 million."  He computed this by:  "The

amount that I invested and the amount that I have lost."  Pokrzywinski Dep., 350:7-20, Pls.

CSOF, Ex. 1; Defs. SOF & Pls. CSOF, ¶ 17.

25.     When asked if there was "any piece of paper anywhere with a calculation" of the

alleged damages, Pokrzywinski asserted the attorney-client privilege on behalf of the Plaintiff

Funds.  And other than documents assertedly protected by the attorney-client privilege, he did not

recall "a specific calculation."  Pokrzywinski Dep., 350:21- 351:4, Defs. SOF ¶ 17, Ex. C.

26.     At deposition, Pokrzywinski was presented with a summary marked "Exhibit A"

that was attached to Plaintiffs' answers to Defendants' interrogatories and another summary that

was marked at his deposition as "Exhibit 9."  These documents summarized the Plaintiff Funds'

purchases and sales of DVI's Senior Notes – however, some transactions were referenced in one

of the summaries that were not referenced in the other summary.  Pokrzywinski was not able to

identify the transactions that were to be included in the calculation of Plaintiffs' damages.

Pokrzywinski Dep., 55:6-57:7, 352:10-18, Def. SOF, Ex. C; Defs. SOF ¶ 17; see also

Pokrzywinski Dep. Exhibit 9, "DVI Transaction History," McEvilly Decl., Ex. 6.

III.     DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  This requires "affirmative evidence . . . from which a jury might return a verdict in his favor."  Id. at 257; Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (must set forth specific facts showing the existence of a genuine issue for trial); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (ruling that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial") (citation and internal quotation marks omitted).

After adequate time for discovery, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  The moving party discharges its burden by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  If the movant succeeds in doing so, there can be no genuine triable disputes because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Id. at 323-25.

Plaintiffs have the burden of proving at trial both loss causation and actual damages – essential elements of a private action under Section 10(b) and Rule 10b-5.  Dura Pharm., Inc. v.

Broudo, 544 U.S. 336, 338, 345-46 (2005) (citing codification of the common law requirement for proof of causation set forth in the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(4));[14] McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424-25 (3d Cir. 2007); accord DVI, Inc. Sec. Litig., 639 F.3d 623, 632 (3d Cir. 2011) (loss causation requires "'a causal connection between the material misrepresentation and the loss'") (quoting Dura, 544 at 342)), abrogated on other grounds, 133 S. Ct. 1184 (U.S. 2013).  Proof of actual economic loss is also crucial.  "Failure to show actual damages is a fatal defect in a Rule 10b-5 cause of action."  Newton v. Merrill Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 177 (3d Cir. 2001) (alteration, citation, and internal quotation marks omitted).  In essence, it must be proven that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  Dura, 544 U.S. at 346.  The requisite proof must be made as to each defendant.  EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(4) ("'plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which plaintiff seeks to recover'")).

As our Court of Appeals has explained, proof of causation in a private securities action under Section 10(b) and Rule 10b-5 is "two-pronged."  McCabe, 494 F.3d at 425.  First, it must be shown that a plaintiff purchased a security at a market price that was artificially inflated by a defendant's public, fraudulent misrepresentation or omission – in other words, proof of "transaction causation" or the "reliance" element.  Id. ("but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security").  Secondly, it must be

---

[14] "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(4).

shown that the artificial inflation was actually lost because of the alleged fraud – in other words, proof of "loss causation." Id., 494 F.3d 418, 425-26 (citing Semerenko v. Cendant Corp., 223 F.3d 165, 184-85 (3d Cir. 2000)). In sum, the loss causation element is satisfied when it is shown that the price of a security at the time of purchase was inflated "due to an alleged misrepresentation" by the defendant, and that the alleged misrepresentation "proximately caused the decline in the security's value." Semerenko, 223 F.3d at 184-85.

In regard to the Section 10(b) and Rule 10b-5 claims here, the Complaint states a fraud-on-the-market theory. Our Court of Appeals has explained that to satisfy the loss causation requirement in a "typical" Section 10(b) fraud-on-the-market case,[15] such as this one:

> the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.

McCabe, 494 F.3d at 425-26; In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 687 (E.D. Pa. 2001), aff'd on other grounds, 277 F.3d 658 (3d Cir. 2002) (it remains plaintiffs' burden to provide evidence supporting a reasonable inference that disclosures of the alleged misrepresentations were in fact made, the market reacted to such disclosures, and the disclosures were a proximate cause of loss) (citing Semerenko, 223 F.3d at 184-87) (dismissal denied where the complaint stated that the security's price "was 'buoyed'" by the misrepresentations, and it "dropped in response to disclosure of the alleged misrepresentations").

In Neas' case, resolution of the question presented is straightforward. Plaintiffs have not identified any public conduct or statements made by Neas that affected the market price for

---

[15] A "typical" fraud-on-the market action is one where "the plaintiff [investor] alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission." McCabe, 494 F.3d at 425. See footnote 12 supra.

DVI's securities.  Plaintiffs acknowledged that prior to this litigation, they did not know who

Neas was, never spoke to him, and never received any written communications from him.  See

Neas' separate Motion for Summary Judgment, Statement of Facts, Doc. No. 261-2 ¶¶ 3, 6, 7-9;

Defs. Supp. Br., Doc. No. 305 at 6.  The record does not contain any evidence that Neas made a

statement about DVI – at any time to anybody – and none of the allegedly false and misleading

statements averred in the Complaint was ever publicly attributed to him.  Under Janus Capital

Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296 (U.S. 2011), Plaintiffs have not come

forward with any evidence establishing triable disputes as to the material misrepresentation and

reliance elements of the Section 10(b) securities fraud claims asserted against Neas.[16]  Given that

failure of proof , Plaintiffs have not shown – because they cannot – that any misrepresentation or

other fraudulent conduct by Neas proximately caused Plaintiffs' claimed economic losses.

Here, Plaintiffs acknowledge that they identified in discovery only two events that they

found pertinent to the fraud alleged against Deloitte and Neas – a September 26, 2003 press

release and the April 7, 2004 Examiner's Report.  Neither meets the standards for proof of loss

causation set by our Court of Appeals.

The September 26, 2003 press release announced an expected upward adjustment in loan

loss reserves that had been reported in DVI's Form 10-Q for the fiscal quater ended March 31,

2003.  However, that Form 10-Q was not audited and contained no audit opinion by Deloitte.  It

was also announced that funds might have been misused during the two months prior to DVI's

---

[16]  These issues are discussed in a separate Order and Memorandum also dated June 27, 2013, deciding Defendant Neas' separate Motion for Summary Judgment (Def. Mot., Doc. No. 261 ) on the alternative grounds that there is a failure of proof on the elements of material misrepresentation and reliance.

bankruptcy (between June 13, 2003 and August 13, 2003 announcement of intent to file). But Deloitte resigned as DVI's auditor on June 2, 2003, before that two-month period commenced. The press release mentioned neither DVI's financial statements nor Deloitte's audit opinions. The market could not have learned from this press release – either in whole or in part – that Deloitte's audits might have falsely or misleadingly certified previous misstatements of DVI's loan loss reserves. Moreover, news of an expected, even significant upward adjustment in loan loss reserves alone is not enough to inform the market about anything that Deloitte or Neas might have said or done. The perceived need for an adjustment could have been occasioned by a myriad of other factors entirely unrelated to the fraud alleged against Deloitte and Neas.

In addition, the Examiner's Report focused on DVI's management and improper financial reporting. The Examiner made no determinations as to whether Deloitte was negligent or breached any professional duties during its audits of DVI. Plaintiffs effectively concede – by not offering a scintilla of evidence to the contrary – that the Examiner's Report did not correct any alleged misstatement or omission in any of Deloitte's audit opinions.

Plaintiffs must show that the market was affected by a fraudulent misrepresentation or omission by Deloitte or Neas. In other words, they must prove that these Defendants' conduct or statements artificially inflated the market price of the Senior Notes and caused a decline in their price when the statement or conduct was revealed to be false or misleading. However, even assuming that Deloitte's unqualified audit opinions artificially inflated the Notes' price, and but for Deloitte's certification of DVI's financial statements, Plaintiffs would not have purchased or sold the Notes, the record does not establish a decline in the market price of DVI's securities that was caused by these Defendants' conduct or statements.

Plaintiffs suggest that the cause of their economic loss is obvious and their damages are evident. There is no doubt, they say, a "stunning and pervasive pattern and practice of fraud" at DVI produced materially false and misleading financial statements by DVI and unqualified audit certifications by Deloitte that were contained in DVI's Form 10-K filings. And this collective fraud caused DVI's eventual financial collapse, bankruptcy, and liquidation. See Pls. CSOF ¶ 13; Pls. Supp. Br., Doc. No. 313 at 8 (citing the Examiner's Report as evidence that "DVI's collapse was caused by a massive fraudulent scheme").[17] Plaintiffs assert that their damages consist of the entire, cumulative price they paid to purchase the Notes plus interest, because the value of the Notes they held eventually became zero during DVI's bankruptcy.[18]

Despite having been served with interrogatories directed to the identification of expert witnesses, Plaintiffs did not designate experts on loss causation and damages prior to the deadline for dispositive motions. Nor have they submitted such expert evidence in opposition to summary judgment here. They disclaim any requirement for expert opinion on these issues. Citing to the "'practical approach'" adopted by our Court of Appeals, which "in effect appli[es] general causation principles,'" McCabe, 494 F.3d at 426 (quoting EP MedSystems, 235 F.3d at 884), they propose that there is an "obvious causal relationship" between the alleged fraud and their damages that does not require expert testimony. Pls. Supp. Br., Doc. No. 313 at 7-8. In their view, it would not be "at all difficult" on this record for a trier of fact to determine that they

---

[17] Also: "But there can be no serious dispute that the Examiner's Report makes clear that the collapse of DVI . . . was caused by a massive fraudulent scheme that was not revealed until approximately eight months after DVI . . . entered bankruptcy and then liquidation." Pls. Br., Doc. No. 266 at 7.

[18] Under this scenario, Plaintiffs would have benefitted from the inflatation for any Notes purchased before and during the fraud, but sold during it. Plaintiffs' summary of their transactions lists various sales of Senior Notes. However, they apparently sue to recover only losses incurred on decisions to buy, hold, retain, or refrain from trading the Notes.

were damaged when they purchased and retained DVI's artificially inflated securities.[19]  Pls. Br., Doc. No. 266 at 10.

Plaintiffs' position assumes that the overall decline in the value of the Senior Notes was due to the collective fraud of all named defendants, which in some unexplained manner subsumes each defendant's individual, contributory wrongdoing.  Such a broad brush accusation of securities fraud is not enough.  Proof must be made as to each defendant.  Moreover, the cause of the Notes' decline cannot be posited – it must be proven.

"'Because of the need to distinguish between fraud-related and non-fraud related influences of the stock's price behavior'" in Section 10(b) cases, an event study[20] or something similar is required.  DVI, 2010 WL 3522090, at *13 (quoting In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003)).  This is so because a security's decline in value may occur in response to numerous factors that have nothing to do with a revelation regarding the alleged fraud:

---

[19]  The only authority cited to support the proposition that "[g]eneral causation principles do not require expert testimony where, as here, there is an 'obvious causal relationship,'" is Bondach v. Faust, No. 10-2032, 2011 WL 3919917, at *4 (E.D.Pa. Sept. 7, 2011).  Pls. Supp. Br., Doc. No. 313 at 7.  That case involved a police officer's state law counterclaim for assault and battery, where the officer was injured while placing the plaintiff under arrest.  It was ruled that the officer did not have to produce an expert report to prove causation of his injuries.  Bondach is inapposite.

[20]  "The almost obligatory event study begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself, and then considering firm-specific events that might have caused those declines."  DVI, 2010 WL 3522090, at *13 (alterations, citations, and internal quotation marks omitted).  Many other courts have described an event study – prepared by an expert witness – as the most prevalent, accepted method to establish loss causation and damages.  See, e.g., Sciallo v. Tyco Int'l Ltd., No. 03-7770, 2012 WL 2861340, at *3 (S.D.N.Y. July 9, 2012) ("an 'event study' . . . seeks to isolate various 'events' and thereby determine [the] relationship between the alleged truthful disclosure, the misstatement and share price decline"); In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) ("a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price").

> Normally, in cases such as this one (*i.e.*, fraud-on-the-market cases) an inflated purchase price will not itself constitute or proximately cause the relevant economic loss. . . . If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

Dura, 544 U.S. at 342-43. See also Sciallo v. Tyco Int'l Ltd., No. 03-7770, 2012 WL 2861340, at *1, 3-4 (S.D.N.Y. July 9, 2012) (in the absence of an expert report on loss causation, "the law does not *assume* a nexus between share decline and fraud, even in a public situation" where a company experienced "a dramatic decline in share prices" and its directors and officers were accused of "a massive securities fraud") (emphasis in original).

Given this "tangle of factors affecting price," Dura, 544 U.S. at 343, and the absence of an expert event study or something similar in this case, Plaintiffs' evidence does not provide a sufficient evidentiary basis to create triable disputes as to loss causation or damages. It must be shown that the decline in market price was due to the defendant's fraud. But this has not been done here. On this record, it cannot be shown what portion of the Senior Notes' price decline might be related or unrelated to the fraud allegedly committed by numerous Defendants other than Deloitte or Neas. Similarly, it cannot be shown what portion might be related or unrelated to the specific fraud allegedly committed by Deloitte or Neas. Moreover, the allegations contained in the Complaint – viewed in their entirety at face value – show that "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together" may account for some significant part, and perhaps all, of the Notes' declining value. Dura, 544 U.S. at 542-43. As the

Supreme Court has recognized, "the longer the time between purchase and sale, the more likely that this is, *i.e.*, that other factors caused the loss." Id. at 343. Although DVI's demise has been portrayed as a sudden collapse, the alleged losses extend over a four-year period. Yet no attempt has been made to isolate from the alleged investment losses any portion of the Notes' price decline that might have been caused by external market forces and DVI-specific or industry-specific facts, conditions, or other events unrelated to the alleged fraud.

Plaintiffs submit a two-page historical list of their transactions – purchases and sales of the Senior Notes, commencing on April 28, 1996 and ending on April 5, 2006. McEvilly Decl., Ex. 6. For each transaction, the inventory does not reflect the number of Notes traded, or any gain or loss realized. In addition, Plaintiffs submit a time-line log of the prices at which the Notes traded on the NYSE, commencing on January 2, 2001 and ending on August 29, 2003. McEvilly Decl., Ex. 9. The price log does not not reflect any decline in the price of the Senior Notes after August 29, 2003 – some six months before the Examiner's Report is said to have first revealed the fraud. Also, it does not reflect any market factors or other events that might have affected the trading prices. Plaintiffs do not proffer any other documentary proof of their purchases or sales of the Senior Notes.

These two summaries are bolstered by Mr. Pokrzywinski's testimony that the claimed losses are "somewhere approaching $20 million," which he computed by "[t]he amount I invested and the amount that I have lost." See Findings ¶¶ 23-26, supra. That amount is not attributed to specific transactions or apportioned among the various transactions. It is not attributed in any proportion to any specific alleged misrepresentation, omission, or other fraudulent statement or conduct by any particular defendant. Pokrzywinski measures the posited

24

loss by the difference between the price at which the Senior Notes sold (i.e., the entire

cumulative price that Plaintiffs paid) and the value of the Notes during DVI's bankruptcy –

"pennies on the dollar" or zero.  In large part, Mr. Pokrzywinski's common sense approach is

used to fix both the existence and the amount of damages claimed.  No other methodology or

measure of damages has been proposed.

The summaries and Pokrzywinski's testimony provide some evidence of the price that

was paid for the Senior Notes.  However, this is not enough to raise triable issues of fact as to

loss causation or damages.   Causation is not satisfied by proof that a plaintiff purchased stock at

an artificially inflated price.  <u>Dura</u>, 544 U.S. at 342, 346-47 (proof of purchase price alone cannot

satisfy loss causation – "the inflated payment is offset by ownership of a share that *at that instant*

possesses equivalent value") (emphasis in original); <u>Semerenko</u>, 223 F.3d at 185 ("In the absence

of a correction in the market price, the cost of the alleged misrepresentation is still incorporated

into the value of the security and may be recovered at any time simply by reselling the security at

the inflated price.").  More must be proven than that the purchase price was inflated due to

fraudulent statements.  It must also be shown that the decline in the market price was due to the

fraud, as oppposed to other market factors.  <u>Dura</u>, 544 U.S. at 343.  <u>See</u> <u>also</u> <u>Gordon Partners v.</u>

<u>Blumenthal</u>, No. 02-7377, 2007 WL 431864, at *13-14 (S.D.N.Y. Feb. 9, 2007) ("Gordon I"),

<u>report and recommendation adopted by</u>, 2007 WL 1438753 (S.D.N.Y. May 16, 2007) ("Gordon

II"), <u>aff'd</u>, 293 Fed. App'x 815 (2d Cir. 2008) ("Gordon III") (plaintiffs failed to prove loss

causation and damages because no evidence of their losses was provided other than the entire

price they paid for the securities); <u>Robbins v. Kroger Prop., Inc.</u>, 116 F.3d 1441, 1448 (11th Cir.

1997) (proof that a plaintiff purchased securities at an artificially inflated price, without more, is

not enough to prove loss causation – a causal connection between the misrepresentation and the investment's subsequent decline is required). Plaintiffs have not provided any evidence of a connection between a misstatement or omission by either Deloitte or Neas and the decline in price of the Senior Notes. Instead, Plaintiffs simply claim they paid too much and lost it all.

Plaintiffs proffer the expert report of Morris I. Hollander, CPA, to establish Deloitte's responsibility for the alleged investment losses. Pls. Br., Doc. No. 266 at 7; Pls. Supp. Br., Doc. No. 313 at 9. Hollander's opinions rest on the fundamental premise that Deloitte did not perform its audits of DVI in accordance with GAAS. In his opinion, the audits were performed "recklessly," "with willful blindness," and "amounted to no audit at all." Hollander Report at 1, McEvilly Decl., Ex. 5, Doc. No. 268-4 at 24. This opinion is only an assumption, however. And his report does not correct shortcomings in Plaintiffs' evidence as to loss causation and damages.

Expert opinions proffered to demonstrate loss causation must meet the standards set by Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579, 592 (1993) and the requirements of Federal Rule of Evidence 702. If evidence could not be presented in admissible form at trial, it is not proper to consider it on summary judgment. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 & n.13 (3d Cir. 1999). Expert opinion evidence is not admissible if it is without a sufficient factual basis and is speculative or conjectural. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) ("expert's opinion must be based on 'the methods and procedures of science' rather than on 'subjective belief or unsupported speculation'") (quoting Daubert, 509 U.S. at 590)). In deciding whether an expert's opinion would be of assistance to the trier of fact, it may be concluded that "'there is simply too great a gap between the data and the opinion proffered.'" Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Hollander's opinion that Deloitte did not perform its audits of DVI in accordance with GAAS is largely based on the Examiner's Report. Hollander, using his personal experience as an accountant and auditor, extrapolates from the Report what he considers to be Deloitte's improper auditing and DVI's improper accounting practices under various professional standards. It is concluded that Deloitte must have breached its duties as an independent auditor. This is so, he says, because DVI's "improper practices . . . should have been discovered by Deloitte had Deloitte performed its audits in accordance with GAAS." Hollander Report at 9, MvEvilly Decl., Ex. 5, Doc. No. 268-4 at 32. But Hollander's subjective experience and beliefs are not enough to determine whether Deloitte breached its professional duties. Furthermore, the record does not contain any evidence that Deloitte, in fact, breached its duties as an independent auditor. But additional unsupported predictions follow from the supposition that Deloitte did not perform its audits of DVI in accordance with GAAS.[21] These also lack a sufficient factual basis or a

___

[21] For example, Hollander surmises:

Had the financial statements been audited in accordance with GAAS, Deloitte would have learned that DVI's financial statements were not presented in accordance with GAAP.

Had the financial statements been presented in accordance with GAAP, investors would have learned DVI was operating at substantial losses. The audited financial statements masked the true financial condition of DVI. Had the financial statements been properly audited in accordance with GAAS, and the true financial condition of DVI been presented, the extensive borrowings and other transactions would not have occurred.

Hollander Report at 2, McEvilly Decl., Ex. 5, Doc. No. 268-4 at 25. These predictions are conjecture – about what DVI's board, executives, lenders, and shareholders would have done if certain hypothetical events had taken place.

Hollander appends to his report an extensive list of "materials relied on," and in some instances, mentions various documents such as Deloitte's management letters and the SEC's communications with DVI. See Hollander Report at 7, 29-30, McEvilly Decl., Ex. 5, Doc. No. 268-4 at 30, 52-53. From those documents, he also extrapolates factual suppositions and generates similar unsupported predictions about what could have, would have, and should have happened. See, e.g., id. at 31, Doc. No. 268-4 at 54 ("The Management Letter comments show that Deloitte was well aware of areas of risk, criticized much of what should have been criticized, but did not follow through on the many red flags that should have led to DVI either correcting weaknesses or the unmasking of the fraudulent financial statements well before the bankruptcy.").

reliable methodology. In essence, Hollander's report offers only his personal beliefs as to what could, would, and should have happened if Deloitte had conducted its audits of DVI in line with his views of GAAS. Because his opinions are "connected to existing data only by the *ipse dixit* of the expert," Joiner, 522 U.S. at 146, they are not the product of reliable methods.

Hollander's opinions do not fit well even within his chosen data base. The Examiner concluded that no determination could be made as to whether Deloitte was negligent or breached any professional duties during its audits of DVI. See Findings ¶ 18, supra. Hollander acknowledges as much. Hollander Report at 7, McEvilly Decl., Ex. 5, Doc. No. 268-4 at 30 ("Examiner believed that further review and investigation was merited for claims and causes of action against Deloitte."). See also Buzzerd v. Flagship Carwash of Port St. Lucie, Inc., 397 Fed. App'x 797, 800 (3d Cir. 2010) (citing In re TMI Litig., 193 F.3d 613, 676 (3d Cir. 1999) ("expert's conclusion that flies in the face of the data is the 'antithesis of good science'")).

Even if it is assumed that Hollander's report provides some evidence of Deloitte's professional wrongdoing, it is never explained why or how such conduct might be probative as to the issues of loss causation and damages. Evidence of breach of professional duty alone – even one leading to an auditing error or misstatement – does not establish a public revelation of a fraudulent misrepresentation or omission that was a substantial factor in causing a decline in a security's price. In sum, Hollander's opinions are of no evidentiary value because they would not assist the trier of fact to determine whether the alleged fraud caused the claimed losses.

Plaintiffs propose that loss causation should be determined solely under an alternative test – the "materialization of risk" theory. Our Court of Appeals has neither adopted nor rejected this theory. See DVI, 2010 WL 3522090, at *7 & n.12 (discussing this approach as applied by courts

in this and other circuits); <u>Bartesch v. Cook</u>, No. 11-1173, 2013 WL 1750455, at *9 (D. Del.

Apr. 23, 2013) (suggesting that the materialization of risk approach is not the law of the Third

Circuit, which "requires that there have been corrective disclosures that exposed the alleged

fraud"). However, Plaintiffs' evidence is also inadequate under the "materialization of risk"

theory. The record does not contain sufficient evidence to show that Deloitte's audit opinions –

among the alleged misstatements and wrongdoing of many other defendants and the criminal

conduct of some – were a substantial, proximate cause of the Senior Notes' ever-declining price.

Under the materialization of risk theory, loss causation is "'the causal link between the

alleged misconduct and the economic harm ultimately suffered.'" <u>Lattanzio v. Deloitte &</u>

<u>Touche LLP</u>, 476 F.3d 147, 157 (2d Cir. 2007) (quoting <u>Lentell</u>, 396 F.3d at 172). Under this

test, loss causation does not differ from the corrective disclosure theory in at least one respect –

both require that actionable misstatements or misconduct be a proximate cause of the alleged

economic losses. Albeit this requirement is formulated differently under the materialization of

risk theory: "A misstatement 'is the "proximate cause" of an investment loss if the risk that

caused the loss was within the zone of risk concealed by the misrepresentations . . . alleged by a

disappointed investor.'" <u>Id.</u> at 157 (quoting <u>Lentell</u>, 396 F.3d at 173) (emphasis omitted)). And

"the plaintiff's loss must be foreseeable." <u>Id.</u> (citing <u>Lentell</u>, 396 F.3d at 174). <u>See also</u>

<u>Bartesch</u>, 2013 WL 1750455, at *9 ("a plaintiff must show that the defendant exposed him to an

undisclosed risk that subsequently materialized and that the materialization of the risk resulted in

the complaint of loss") (citation and internal quotation marks omitted)).

Here, the risk that Deloitte's unqualified audit opinions allegedly concealed has not been

adequately delineated. <u>See</u> Pls. Br., Doc. No. 266 at 7 (citing <u>Lentell</u> for the proposition that

"loss causation is akin to proximate cause, and exists when risks concealed by the fraud materialize and harm investors"). It is suggested only that "risks associated with the accuracy of the financial statements were among the reasons why investors cared in the first place that DVI's financial statements were being accurately presented and Deloitte and Neas were certifying that they were." Pls. Br., Doc. No. 266 at 7. As the Supreme Court has recognized, the "SEC requires the filing of audited financial statements in order to obviate the fear of loss from reliance on inaccurate information, thereby encouraging public investment in the nation's industries." United States v. Arthur Young & Co., 465 U.S. 805, 819 n.14 (1984). But beyond suggesting this legitimate public interest, Plaintiffs do not clarify what "risks associated" with DVI's financial statements materialized and caused their investment losses.

Perhaps the risk contemplated by Plaintiffs is inaccurate information – allegedly occasioned by Deloitte's audits that were not conducted in accordance with GAAS and DVI's financial statements that were not prepared in accordance with GAAP. If so, materialization of that risk – an actual auditing or accounting error (a misstatement) – cannot be conflated with proof of loss causation:

> But if Lentell's "zone of risk" could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement.

Lattanzio, 476 F.3d at 157.

Or perhaps it is Plaintiffs' position that Deloitte's unqualified audit opinions concealed the risk of DVI's rapid, precipitous financial collapse and bankruptcy. This also would be unsuccessful. Proof of DVI's collapse into bankruptcy does not provide proof of a causal connection between Deloitte's unqualified audit opinions and the decline in the Senior Notes'

price.  See Lattanzio, 476 F.3d at 157-58 (finding that the proposed risk of bankruptcy was not

"altogether concealed," and plaintiffs had "not alleged facts to show that Deloitte's

misstatements, among others [made by the bankrupt company] that were much more

consequential and numerous, were the proximate cause of plaintiffs' loss"); See also id. (risk of

impending bankruptcy was not concealed by an audit opinion); D.E.&J. Ltd. P'ship v. Conaway,

133 Fed. App'x 994, 1000  (6th Cir. 2005) ("And, of course, the filing of a bankruptcy petition

by itself does not a security fraud allegation make.").  The proposed causal chain is simply too

attenuated to justify liability.

Plaintiffs contend that but for Deloitte's unqualified audit opinions, their portfolios would

not have been exposed to the risk of DVI's demise.  But this is only a hypothesis.  Moreover, at

best it amounts to hindsight identification of perhaps a necessary condition of loss in this case.

But no admissible evidence shows that had Deloitte's opinions informed investors that DVI's

financial statements were misstated or otherwise improper, DVI could have or would have

averted bankruptcy, and Plaintiffs could have or would have protected their investments.

Plaintiffs also suggest that Deloitte's auditing conduct caused DVI's collapse.  As they

acknowledge, however, DVI's bankruptcy was the product of numerous factors and the actions of

many others besides Deloitte and Neas.  For example, DVI failed to make the August 1, 2003

interest payment on the Senior Notes.  Compl. ¶¶ 7, 191.  In other litigation, DVI's bankruptcy

trustee admitted that "'the defaults under the indenture governing the Notes and the resulting

cross-defaults under DVI's other loan and credit agreements" could be considered "an immediate

precipitating factor of DVI's bankruptcy.'"  Buckley v. Deloitte & Touche USA LLP, 888 F.

Supp. 2d 404, 411 (S.D.N.Y. Aug. 16, 2012) (quoting record).  Also, DVI's CEO, Michael

O'Hanlon testified: "'By simply paying the bonds, [DVI] would have avoided a default and then all the cross default consequences that a default on the bonds caused.'" Id. (quoting record). A further example: DVI's CFO, Steven R. Garfinkel's criminal conduct in pledging ineligible collateral to DVI's lenders "was not a foreseeable consequence of Deloitte's auditing." Id. at 419-20. As to the tort claims in that case, it was ruled that Deloitte could not be held legally accountable for DVI's collapse because the causal chain fell short of proximate causation. Id.

Because the record does not contain any evidence that Deloitte's audit opinions were a substantial cause of any decline in price of the Senior Notes, Plaintiffs cannot prove any damages actually caused by those audit opinions. See 15 U.S.C. § 78bb(a) (permitting recovery only of "actual damages"). Moreover, this case does not warrant a departure from the general rule that requires expert testimony to establish "both the fact of damage and the appropriate method of calculation." Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir. 1991); DVI, 2010 WL 3522090, at *13 (expert opinion evidence is required to "'distinguish between fraud-related and non-fraud related influences of the stock's price behavior'" in Section 10(b) cases) (quoting In re Imperial Credit, 252 F. Supp. 2d at 1014-15).

In a private securities fraud action, the proper and traditional measure of damages to reflect the loss proximately caused by a defendant's deceit is the out-of-pocket rule. In re Cendant Corp. Litig., 264 F.3d 201, 242 n.24 (3d Cir. 2001) (citing Sowell, 926 F.2d at 297). This rule measures "the difference between the price paid for a security and the security's 'true value'" – i.e., "the price paid minus the inflation attributable to the defendants' alleged wrongful acts." Id.; accord In re Imperial Credit, 252 F. Supp. 2d at 1014 ("measured by the difference between the price at which the stock sold and the price at which the stock would have sold absent

the alleged misrepresentation or omissions") (citing <u>Affiliated Ute Citizens of the State of Utah v. United States</u>, 406 U.S. 128, 154-55 (1972)). Thus, in order to perform this calculation of damages, "that portion of the price decline or price difference which is unrelated to the alleged wrong" must be identified and removed from the price at which the stock sold. <u>Id.</u> at 1014-15.

Here, Plaintiffs have adduced only some evidence of their transactions and the prices paid for the Senior Notes. Their approach – including their calculation of damages as proposed by Pokrzywinski – assumes that the decline in value of the Notes was due entirely to the named defendants' collective fraud. It is suggested that each defendant is jointly and severally liable for the cumulative total price of all of the purchased Notes. Damages are claimed for all previously-owned and purchased Senior Notes that they did not sell during the period of the alleged fraud, August 10, 1999 through August 13, 2003. Compl. ¶¶ 1, 12. In their view, they were damaged when they purchased and retained DVI's artificially inflated securities because "absent the materially false and misleading statements and omissions resulting from defendants' massive fraudulent scheme at DVI," the Senior Notes were worthless. Pls. Br., Doc. No. 266 at 2-3.

Plaintiffs' proposed measure of damages does not take into account any portion of the price decline related to the fraud allegedly committed by numerous defendants other than Deloitte and Neas. And no proof of damages arising from these Defendants' conduct has been provided. Moreover, other contributing forces have not been isolated and removed from the entire purchase price demanded. The record shows that other factors most likely did affect the price of the Senior Notes.

In regard to their Section 10(b) claims, Plaintiffs have not met their burden of coming forward with evidence creating triable disputes as to loss causation and damages. Moreover, for

the same reasons that the Section 10(b) claims fail, Plaintiffs' claims against Deloitte under Section 18 of the Exchange Act and Pennsylvania's common law of fraud also fail.

Section 18 of the Exchange Act grants a right of action to any person who purchases or sells a security in reliance on a false or misleading statement of material fact included in any document filed with the SEC pursuant to the Exchange Act. 15 U.S.C. § 78r(a); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 283 (3d Cir. 2006). Sections 10(b) and 18 both require proof of loss causation and damages – i.e., proof of economic injury caused by a defendant's misrepresentation. See 15 U.S.C. § 78r(a) (in part, a plaintiff must show that it "purchased or sold a security at a price which was affected by such [false or misleading] statement"). The loss causation and damage elements under Sections 10(b) and 18 of the Exchange Act are "coterminous." Argent Classic Convertible Arbitrage Fund v. Rite Aid-Corp., 315 F. Supp. 2d 666, 685 (E.D. Pa. 2004) (granting dismissal of Sections 10(b) and 18 claims based on inadequate allegations of reliance and economic loss). See also Kelley v. Rambus, Inc., No. C 07-1238, 2008 WL 5170598, at *9, 16 (N.D. Cal. Dec. 9, 2008) (Section 18 requires that a plaintiff "identify securities . . . whose price was affected by specific misstatements or omissions in . . . the 10K"). Plaintiffs have not come forward with the requisite proof.

The elements of Pennsylvania's common law cause of action for fraud are essentially the same as those of a private action for federal securities fraud. McCabe, 494 F.3d at 438; Sowell, 926 F.2d at 296 (elements are "similar"). Plaintiffs acknowledge this. WM High Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446, at *12 (E.D. Pa. May 13, 2005). A "common thread" running through these theories "is the necessity for proof of damages flowing from the defendants' conduct." Sowell, 926 F.2d at 296. See Argent, 315 F. Supp. 2d at 685 (granting

dismissal of Sections 10(b) and common law fraud claims based on inadequate allegations of loss causation); Sciallo, 2012 WL 2861340, at *6 (granting summary judgment on federal and common law fraud claims because there was no evidence as to loss causation – an essential elements of all of those claims) (citing King County, Wash. v. IKB Deutsche Industriebank AG, 708 F. Supp. 2d 334, 342 n.57 (S.D.N.Y. 2010) (Dura's holding under the federal securities laws is also applicable to common law fraud claims because the element of causation is treated the same in both)). See also Bortz v. Noon, 729 A.2d 555, 560-61 (Pa. 1999) (stating common law elements and citing Restatement (Second) of Torts § 525 (1977)); accord Weston v. Northampton Personal Care, Inc., 62 A.3d 947, 960 (Pa. Super. Ct. 2013). Because Plaintiffs have not created a genuine issue as to loss causation as required by their Section 10(b) claims, that also constitutes a failure to create a genuine issue as to proximate causation as required by their claims under Pennsylvania's common law of fraud.

IV.  CONCLUSION

For the reasons set forth above, Defendants Deloitte's and Neas' joint motion for summary judgment will be granted. Summary judgment will be granted in favor of Deloitte and Neas, and against Plaintiffs, on the Section 10(b) and Rule 10b-5 claims contained in Count I of the Complaint. Summary judgment will also be granted in favor of Deloitte and against Plaintiffs on the Section 18 claims contained in Count III, and the common law fraud claims contained in Count IV, of the Complaint. Because the Complaint does not contain any other claims that have not been previously dismissed as to these Defendants, judgment will be entered in favor of Deloitte and Neas, and against Plaintiffs, on all claims contained in the Complaint.

An Order accompanies this Memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.