IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WM HIGH YIELD FUND, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 04-3423 |
| MICHAEL A. O'HANLON, et al. | : | |

MEMORANDUM

Legrome D. Davis, J.                                         August 12, 2013

Plaintiffs[1] – six institutional Funds that invested in debt securities issued by Diagnostic

Ventures, Inc. (DVI, Inc.)[2] – sue for violations of Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5. They also seek imposition of

liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 18 of the Exchange

Act, 15 U.S.C. § 78r; and Pennsylvania's common law of fraud.[3] Jurisdiction is the Exchange

Act, 15 U.S.C. § 78aa; federal question, 28 U.S.C. § 1331; and supplemental over the state law

claims, 28 U.S.C. § 1367.

Defendant Gerald L. Cohn – a former director on DVI's Board of Directors and

longstanding member of the Board's credit committee – moves for summary judgment (Doc.

Nos. 257, 257-1). Fed. R. Civ. P. 56. The motion asserts that the record does not establish

---

[1] The Plaintiff Funds are WM High Yield Fund; WM Income Fund; WM VT Income Fund; AT High Yield Fund; AT Income Fund; and Stellar Funding, Ltd.

[2] In the mid-1980s, Diagnostic Ventures, Inc. was formed as a Delaware corporation. About 1986, it changed its name to DVI, Inc. By the mid-1990s, it operated as a finance company for healthcare providers through two subsidiaries – DVI Business Credit, Inc. ("DVI BC") and DVI Financial Services, Inc. ("DVI FS"). Here, "DVI" refers collectively to all of these business entities unless noted otherwise. See Compl. ¶¶ 3, 45, 54-55; Def. Cohn's Statement of Facts ¶¶ 1-7, Doc. No. 257-2 at 1-2 (DVI's history).

[3] For the history and factual background of this action see WM High Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446 (E.D. Pa. May 13, 2005) (Apr. 29, 2005 Order and May 13, 2005 Am. Mem., Doc. Nos. 108, 112; and Feb. 23, 2006 Order, Doc. No. 165).

triable disputes as to essential elements of a private securities action[4] – a misrepresentation or omission of material fact and scienter, *i.e.*, a wrongful state of mind.[5] Def. Br., Doc. No. 257-13 at 10-21. This lack of proof, it is contended, defeats the Section 10(b) and Rule 10b-5[6] claims contained in Count I of the Complaint as well as the the common law fraud claims contained in Count IV of the Complaint. Id. at 10, 26-27.

Defendant Cohn's motion cites Tellabs, Inc. v. Makor Issues & Rights, Ltd. for the rule that an inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. 308, 314, 324 (2007). It is contended that "the inference of nonfraudulent intent – that Mr. Cohn was a victim of management's fraudulent scheme – would be the more compelling one." Def. Reply Br., Doc. No. 279 at 8; Def. Br., Doc. No. 257-13 at 11-12, 17-20. In Cohn's view, "[t]his is a case about directors who were deceived." Id. at 14. This memorandum agrees.

---

[4]  The essential elements of a Section 10(b) and Rule 10b-5 private cause of action are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008); accord Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 n.3 (U.S. 2011).

[5]  In essence, the element of "scienter" requires proof that the defendant made a misrepresentation or omission of material fact with "'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)); accord Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 493 (3d Cir. 2013).

[6]  Subsections (a) and (c) of Rule 10b-5, respectively, make it unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud." 17 C.F.R. § 240.10b-5(a), (c). Subsection (b) of Rule 10b-5 prohibits "mak[ing] any untrue statement of material fact" or omitting a material fact necessary to clarify prior misleading statements. Id. § 240.10b-5(b). "We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements." In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011), abrogated on other grounds, 133 S. Ct. 1184 (U.S. 2013).

The motion for summary judgment also contends that Cohn cannot be held liable under the Section 20(a) claims contained in Count II of the Complaint because the record does not establish a threshold requirement – that he actually controlled DVI, the alleged violator of the securities laws, Section 10(b).[7] An affirmative defense is asserted to both the Section 20(a) and Section 18[8] claims contained in Count III of the Complaint – that Cohn acted in good faith and was not a culpable participant in the alleged fraud. Def. Br., Doc. No. 257-13 at 22-24. And he had no knowledge that DVI's filings with the Securities and Exchange Commission (SEC) were false or misleading. Id. at 25-26; Def. Reply Br., Doc. No. 279 at 11-13.

Plaintiffs oppose summary judgment,[9] broadly asserting that a group of individually named Defendants – defined in the Complaint to include Cohn – signed DVI's "materially false" filings with the SEC and "otherwise were directly and personally involved in the improper and deceptive practices that artificially inflated DVI's reported financial results." Pls. Br., Doc. No. 272 at 4. Cohn, they say, together with the other individual Defendants, "turned a blind eye to the massive fraud being perpetrated on investors." Id.

---

[7] "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

[8] "Section 18 creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC [Securities Exchange Commission] pursuant to the Exchange Act . . . ." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 283 (3d Cir. 2006); Section 18 of the Exchange Act, 15 U.S.C. § 78r(a) (in part, a defendant may avoid liability by showing "that he acted in good faith and had no knowledge that such statement was false or misleading").

[9] Both sides submitted proposed undisputed facts, and Plaintiffs responded specifically to the facts stated by Defendant Cohn, disputing and objecting to most. Def. Cohn's Statement of Facts (SOF), Doc. No. 257-2; Pls. Counter-Statement of Facts (CSOF), Doc. No. 273. Those responses do not present any genuine disputes material to a decision on the motion for summary judgment presented here.

Cohn's alleged signature on DVI's annual Form 10-K filings with the SEC is the primary basis for the case against him.  See Compl. ¶¶ 35, 106, 123, 164, 310.  However, Plaintiffs more broadly assert that Cohn also signed DVI's quarterly Form 10-Q filings with the SEC for the fiscal years ended June 30, 1999 through June 30, 2002, and signed DVI's first three Form-Q filings for the fiscal year ended June 30, 2003.  Pls. Br., Doc. No. 272 at 5-6.  The record does not contain the cited documents that are said to exhibit Cohn's signature.

Both sides acknowledge that DVI's independent auditor, Deloitte & Touche LLP, issued and signed unqualified audit opinions[10] for DVI's annual Form 10-K filings with the SEC, certifying the soundness of DVI's financial statements for the fiscal years ended June 30, 1999 through June 30, 2002.  Plaintiffs say that Deloitte's audit opinions "falsely represented to investors as fact that its audits of DVI's financial statements were performed in accordance with Generally Accepted Auditing Standards (GAAS) and that DVI's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles (GAAP), which falsely reassured investors as to their accuracy."  Pls. Br., Doc. No. 272 at 4.  Also, it is averred, they "read and relied on the financial information" contained in DVI's Form 10-K filings, including Deloitte's unqualified audit opinions, which were "false and misleading."  Compl. ¶¶ 305-308.  In Plaintiffs' view, Cohn – by signing DVI's filings with the SEC – made the same alleged misstatements or omissions of material fact as those assertedly made by DVI and Deloitte.

As to scienter, Plaintiffs' argument is based primarily on Cohn's "role" or "function and involvement" at DVI.  Pls. Br., Doc. No. 272 at 6, 8.  It is asserted that "he and his family had a

---

[10]  See generally United States v. Arthur Young & Co., 465 U.S. 805, 810-11, 818-19 & nn.13, 14 (1984) (explaining the role of an independent auditor, as required by SEC regulations, and the meaning of an auditor's unqualified opinion in the marketplace).

significant personal investment in DVI" and he "was personally involved in using his contacts to facilitate DVI accessing the capital markets for financing." Id. That Cohn was a director and member of the Board's credit committee is cited as proof that he "was heavily involved in DVI's daily operations." Id. at 6, 8, 9.

In addition, Plaintiffs say that Cohn either "knew or was reckless in not knowing" that DVI " was processing credit applications in disregard of its own published policies" by making loans without the credit committee's approval. Pls. Br., Doc. No. 272 at 9. Also, they say, Cohn knew that Lisa Cruikshank – Vice President, Treasury of DVI FS – resigned "due to her refusal to continue falsifying [loan covenant] compliance reports." Id. at 6, 10. They further say that "by no later than April of 2001," Cohn "was fully aware" that DVI was out of compliance with some covenants to its lender, Fleet Bank.[11] Id. at 6, 9-10. In Plaintiffs' view, this reveals that Cohn was not an "outside director," but rather "was the ultimate insider . . . involved with DVI's daily operations since its inception" as well as DVI's alleged fraud. Id. at 8.

The motion for summary judgment will be granted. The record does not show that under Section 10(b), Cohn made any actionable misstatements or omissions with the requisite scienter. The common law fraud claims fail for similar reasons. The record also establishes that under Section 20(a), he did not exercise actual power or influence over the allegedly controlled violator of the securities laws, DVI. The Sections 18 claims fail as well for several reasons – including Cohn's good faith and lack of knowledge that DVI's public filings were false or misleading.

---

[11] DVI had several sources of capital from which it financed loans to customers. One was a syndicate of lenders headed by Fleet Bank. See Jan. 28, 2008 Michael A. O'Hanlon Dep., 55:15-58:3, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. B, Doc. No. 683-4 at 41-42. Fleet provided a "warehouse" line of credit: "DVI would borrow money against a line of credit that was established with the bank by providing them with original documentation, in which they would borrow a set percentage of the total value of the loan that was part of the document." Id., 57:6-11, Doc. No. 683-4 at 42; Def. Cohn's SOF ¶ 38.

I.      PROCEDURAL AND FACTUAL BACKGROUND

The Complaint, as filed on July 19, 2004, avers that during August 10, 1999 through

August 13, 2003, the Plaintiff Funds invested in DVI's bonds that traded on the New York Stock

Exchange (NYSE) – 9$^{7/8}$ percent "Senior Notes," which had been issued in 1997 and 1998.[12]

Compl. ¶¶ 1, 12, 285.  During that four-year period, it is averred that Cohn, individually and

together with other DVI officers, directors, and business entities, "engaged in a scheme to falsify

DVI's financial results and overstate its earnings by at least $120 million."  Id. ¶ 1.  This was

done to "deceive . . . the investing public as to the true financial condition of DVI," and

"artificially inflate and maintain the market price of DVI's securities" – all in violation of Section

10(b) and Rule 10b-5.  Id. ¶¶ 6, 35, 40, 44, 238-239, 242, 291-299 (Count I).

On August 13, 2003, DVI disclosed its intention to file for bankruptcy protection.

Compl. ¶¶ 8, 197.  On August 25, 2003, DVI, DVI FS, and DVI BC filed for Chapter 11

bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware,[13] and the

liquidation of assets began.  Id. ¶¶ 10, 45, 200.  On April 7, 2004, the Chapter 11 Examiner, R.

Todd Nielson, CPA, issued an investigative report on the Debtors' financial transactions,

accounting practices, and potential wrongdoing, among other topics.  Id. ¶ 11; Ex'r Rep., dated

Apr. 7, 2004, Decl. of James P. McEvilly, III, Ex. 2, Doc. Nos. 274-1 at 6 through 274-3 at 81.

_____

[12]  The Complaint invokes a presumption of reliance on "the integrity of the market price of the
Senior Notes."  Compl. ¶¶ 1, 12, 285, 290, 297.  Under the "fraud-on-the-market" doctrine, a plaintiff
investor that buys or sells a publicly-traded security may invoke a rebuttable presumption of reliance on the
integrity of the market price for that security.  Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988).  Most
publicly available information is reflected in the security's market price.  Id.  When statements or conduct
become public, "[t]hen it can be assumed that an investor who buys or sells stock at the market price relies
upon the statement [or conduct]."  Stoneridge, 552 U.S. at 159 (citing Basic, 485 U.S. at 247).

[13]  In re DVI, Inc., DVI Fin. Serv., Inc., & DVI Bus. Credit Corp., Case Nos. 03-12656 through 03-
12658, filed in the U.S. Bankruptcy Court for the District of Delaware (Mary F. Walrath, J.).

Cohn – one of the original investors in DVI – became a director on DVI's Board of Directors from about 1986 until DVI's eventual dissolution sometime after August 25, 2003. Compl. ¶ 35; Feb. 12, 2008 Cohn Dep., 96:1-98:8, 103:5-104:12, 136:2-5, Affidavit of Julian W. Friedman, Ex. A, Doc. No. 257-4 at 5-7, 11.  See also Ex'r Rep. at 18, Doc. No. 274-1 at 28; Pls. Omnibus Br. in Opposition to All Defs. Mots. to Dismiss the Compl. at 10, Doc. No. 63 at 31. Cohn served on the Board's credit committee from about 1988 until sometime after August 25, 2003.  Feb. 12, 2008 Cohn Dep., 134:17-135:4, Friedman Aff., Ex. A., Doc. No. 257-4 at 11.

It is averred that the group of named individual Defendants, which is defined to include Cohn, "was responsible for or participated in drafting, producing and disseminating the false and misleading statements alleged . . . and orchestrating the deceptive scheme to manipulate the Company's credit and accounting practices and policies."  Compl. ¶¶ 44, 40-44.  As to any actionable statements made specifically by Cohn, the Complaint avers generally that he "signed DVI's Annual Reports on Form 10-K for the fiscal years 1999, 2000, 2001 and 2002."  Id. ¶ 35. However, he is named as a signatory to DVI's Form 10-Ks only for the fiscal years 1999, 2000, and 2002.  Id. ¶¶ 106, 123, 164, 301 (Counts I & II), 306, 310 (Count III) (he is not named as a signatory to DVI's Form 10-K for fiscal year 2001 nor any of its Form 10-Qs).  None of the other allegedly false and misleading statements – including press releases and public announcements – named Cohn and none was ever publicly attributed to him.  See id. ¶¶ 104-181 (misstatements).

The Complaint contains some averments as to Cohn's actionable conduct and state of mind, which are based largely on the Examiner's Report:

- In April or May of 2001, Steven R. Garfinkel – an Executive Vice President and Chief Financial Officer of DVI – told Cohn that Lisa Cruikshank "was resigning because she was 'uncomfortable about signing collateral statements' certifying that the pledged collateral met Fleet's lending criteria." Compl. ¶ 99.

- During that conversation in April or May of 2001, Garfinkel also told Cohn "DVI was out of compliance on borrowings from Fleet." Compl. ¶ 99.

- Cohn "repeatedly raised this issue" with Michael A. O'Hanlon – DVI's Chief Executive Officer, President, and Director – "who assured [Cohn] that he would fix, and later had fixed, the problem but Cohn never raised the out-of-compliance problem at any Board meeting." Compl. ¶ 99.

- During a Board meeting in April of 2001, Cohn asked Garfinkel "whether DVI was 'in compliance,' to which Garfinkel responded that DVI 'drifts in and out of compliance' and O'Hanlon added that DVI was 'not in compliance.'" Compl. ¶ 101. Another member of DVI's Board of Directors, Nathan Shapiro who was present at that meeting "inquired whether this was a 'serious problem,'" and O'Hanlon "responded that 'lots of companies are never in compliance; we will get it fixed; let's move on,' or words to that effect, bringing the discussion to a close." Id.

- During a Board meeting in December, 2002, Matthew Goldenberg – DVI's Vice President, Finance and Securitizations – asked Garfinkel "if DVI was 'in compliance,'" and "Garfinkel responded that while DVI might be incompliance at the end of the year, it definitely was not in compliance in the interim months." Compl. ¶ 102. Garfinkel explained "that 'Fleet will take great exception to the value and eligibility of their collateral.'" Id.

- "Cohn [was] aware of or recklessly disregarded steps O'Hanlon, Garfinkel, . . . and others took to falsely enhance DVI's reported financial condition and prospects." Compl. ¶ 239.

- Cohn, "as well as other Board members," were "alerted . . . to improper steps taken to mask loan losses and artificially inflate performance in the Securitizations,"[14] but "the Board members failed to take any corrective actions and with this knowledge signed the Company's materially false and misleading SEC filings." Compl. ¶ 239.

- Cohn received "Management Letters" authored by DVI's independent auditor, Deloitte, that "criticiz[ed] DVI's . . . improper revenue recognition standards and other poor accounting and financial reporting practices and procedures." Compl. ¶ 242. Cohn "did little, if anything, to address and remedy the concerns raised therein." Id.

---

[14] Another source of capital for DVI was an "asset-based securitization." Ex'r Rep. at 34, McEvilly Decl., Ex. 2, Doc. No. 274-1 at 44. This, in "simplest terms," is "a process in which a pool of contracts [DVI's loans to customers] is transferred to a special-purpose financing entity that issues notes to investors. The notes are secured by a pledge of the assets or other collateral in the contract pool. Principal and interest on these notes are paid from the cash flows produced by the contract pool." Id.; see also Jan. 28, 2008 O'Hanlon Dep., 61:19-63:21, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. B, Doc. No. 683-4 at 43; Def. Cohn's SOF ¶ 38.

- "Cohn as a member of DVI's Credit Committee knew or should have known that DVI was making loans without proper approvals, often to already delinquent borrowers or to new borrowers to mask existing delinquencies." Compl. ¶ 242.

In addition, it is averred that the group of named individual Defendants were "controlling persons of DVI" under Section 20(a). Compl. ¶¶ 41, 300-303 (Count II). "By reason of" their positions with DVI, they "controll[ed] the content" of its public statements and "participated in the drafting, preparation, and/or approval of such statements." Id. ¶¶ 41, 42-44, 301. Also "[b]y virtue of" their positions, they "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading." Id. ¶ 301. And given their "direct involvement in the day-to-day operations" of DVI, they are "presumed to have had the power to control or influence the particular transactions giving rise to the securities transactions" here. Id. ¶ 302. Count II of the Complaint does not contain averments as to any conduct or statements made specifically by Cohn.

The same averments that are marshaled to state a securities fraud claim are used to state a claim under Pennsylvania's common law of fraud. It is averred that Cohn, together with other DVI officers, directors, and DVI's auditor, Deloitte, "engaged in a scheme and made material misrepresentations, or omitted to disclose material facts, to Plaintiffs and the investing public regarding DVI's financial condition." Compl. ¶¶ 317, 315-322 (Count IV). Again, no averments are made as to any conduct or statements made specifically by Cohn.

On October 29, 2004, Cohn and other Defendants separately moved to dismiss the Complaint. Fed. R. Civ. P. 12(b)(6); Def. Cohn's Mot., Doc. No. 37. As to Cohn, all claims were dismissed except those asserted under Sections 10(b), 20(a), and 18, and Pennsylvania's

common law of fraud.  WM High Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446, at

*6, 8, 9-13, 14-15, 17-18 (E.D. Pa. May 13, 2005) (Apr. 29, 2005 Order and May 13, 2005

Amended Mem., Doc. Nos. 108, 112; and Feb. 23, 2006 Order, Doc. No. 165).  It was ruled that

the Complaint contains plausible averments that Cohn made actionable statements or omissions

and engaged in manipulative or deceptive conduct.  And as to him, the Rule 10b-5(a),(b), and (c)

claims were not dismissed.  Id., 2005 WL 6788446, at *6, 8 (also "only Defendants to whom a

misleading statement is attributable may be held liable").  It was also ruled that to the extent

Plaintiffs sought to hold Cohn liable under Section 10(b) as a "secondary" violator, those claims

were dismissed.  Feb. 23, 2006 Order, Doc. No. 165; see also id., 2005 WL 6788446, at *7

(ruling that Cent. Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164

(1994) precluded "secondary" or "aiding and abetting" liability).

By Order dated February 26, 2013 (Doc. No. 304), the parties were permitted to

supplement their summary judgment papers with concise briefing on significant rulings recently

issued by the Supreme Court, our Court of Appeals, and this Court.[15]  Neither side submitted

supplementary papers.  The motion for summary judgment will now be decided.

II.    SUMMARY JUDGMENT FINDINGS OF UNDISPUTED MATERIAL FACT

1.    Deloitte signed and issued the audit opinions in question, certifying the soundness

of DVI's annual financial statements for fiscal years ended June 30, 1999 through June 30, 2002.

See WM High Yield Fund v. O'Hanlon, No. 04-3423, 2013 WL 3230667 at *4, Findings ¶ 3

(E.D. Pa. June 27, 2013) (Davis, J., deciding Defendants Deloitte's and Harold Neas' joint

motion for summary judgment).

---

[15]  In this action, fact discovery closed on May 2, 2008 (Seventh Am. Case Mgmt. Order, Doc. No.
243), and expert discovery closed on March 2, 2009 (Ninth Am. Case Mgmt. Order, Doc. No. 250).  The
instant motion for summary judgment was filed on April 30, 2009 (Doc. Nos. 257, 257-1).

2.      Plaintiffs have not identified any specific line-item entry, computation, or portion of DVI's annual financial statements for DVI's fiscal years ended June 30, 1999 through June 30, 2002 that allegedly makes Deloitte's unqualified audit opinions materially inaccurate, incomplete, false, misleading, or deceptive.  See WM High Yield Fund, 2013 WL 3230667 at *7, Findings ¶ 21.

3.      Plaintiffs have not identified any portion of the Examiner's Report that corrected any specific misstatements or omissions of material fact allegedly made by Deloitte, and the Report did not correct any specific misstatements or omissions of material fact allegedly made by Deloitte that affected the market price for DVI's securities.  See WM High Yield Fund, 2013 WL 3230667 at *6, Findings ¶¶ 19-20, *10, 14.

4.      For fiscal year ended June 30, 2003, DVI signed and made the statements contained in its Form 10-Q filings for the first three fiscal quarters (ended March 31, 2003).  And the record does not contain any evidence that either Deloitte or Cohn signed any audit opinions or DVI's quarterly financial statements, or otherwise made any public statements by certifying or endorsing DVI's quarterly financial statements.  See WM High Yield Fund, 2013 WL 3230667 at *4, Findings ¶ 5.

5.      Plaintiffs have not identified any specific line-item entry, computation, or portion of DVI's annual financial statements for DVI's fiscal years ended June 30, 1999 through June 30, 2002, or DVI's quarterly financial statements for DVI's fiscal year ended June 30, 2003, that allegedly makes Cohn's signature on any of DVI's filings with the SEC materially inaccurate, incomplete, false, misleading, or deceptive.

6.      The record does not contain any evidence that Cohn signed any of DVI's filings with the SEC – at any time – and none of the allegedly false and misleading statements averred in the Complaint was ever publicly attributed to Cohn.  See Compl. ¶¶ 104-181.  See also Def. Cohn's Statement of Facts (SOF), Doc. No.  257-2; Pls. Counter-Statement of Facts (CSOF), Doc. No. 273.

7.      Cohn does not deny that he signed some of DVI's annual Form 10-K filings with the SEC for the fiscal years ended June 30, 1999 through June 30, 2002.  His position appears to acknowledge as much.  See, e.g., Def. Br., Doc. No. 257-13 at 25 ("the Form 10-Ks signed by Mr. Cohn"), 27 ("Mr. Cohn did not know that the Form 10-Ks that he signed were false."); Def. Reply Br., Doc. No. 279 at 6 (asking the Court to decide whether "the signing of SEC filings constitute[s] a misstatement under the federal securities laws").

8.      The record does not contain any evidence that Cohn acted in a misleading, manipulative, deceptive, or fraudulent manner – and none of the fraudulent conduct averred in the Complaint was ever publicly attributed to him.  See Def. Cohn's SOF & Pls. CSOF.

9.      The record does not contain evidence of any public conduct or statements made by Cohn that affected the market price for DVI's securities.  See Def. Cohn's SOF  & Pls. CSOF.

10.      The record does not contain any evidence that Cohn signed any documents, made any public statements, or otherwise acted with a mental state embracing intent to deceive, manipulate, or defraud – or that he acted with conscious, reckless disregard of the interests of the investing public.

11.      The record suggests that at all pertinent times Cohn acted honestly and in good faith.  The record contains no evidence to the contrary.

12.     Gary Pokrzywinski, a portfolio fund manager of WM Advisors – an investment advisor for each of the Plaintiff Funds – testified as Plaintiffs' Federal Rule of Civil Procedure 30(b)(6) designee.  He was "solely" responsible for the analysis that led to Plaintiffs' purchases of DVI's bonds.  Nov. 6, 2007 Pokrzywinski Dep., 49:16-21, 78:18-82:12, 294:16-22, Friedman Aff., Ex. BB, Doc. No. 257-12 at 21, 30-33, 43.  Def. Cohn's SOF ¶ 105.

13.     When asked whether there were "any particular line items in DVI's financial statements" that he believed were "misstated," Pokrzywinski testified:

> There was a – the general workings of the financial statements would seem to be misstated. . . . The general idea of flow of Funds, losses, representation of assets, I mean, just the overall foundation of the financial statement.

Nov. 6, 2007 Pokrzywinski Dep., 326:2-13, 327:19-24, Friedman Aff., Ex. BB, Doc. No. 257-12 at 45-46.  He could not identify any specific misstatements.  Def. Cohn's SOF ¶ 108.

14.     When asked whether DVI incorrectly reported income or loss for any specific year, Pokrzywinsk testified:  "It was not representative of what was going on, correct."  Nov. 6, 2007 Pokrzywinski Dep., 328:2-6, Friedman Aff., Ex. BB, Doc. No. 257-12 at 46.  When asked what should have been the income or loss reported for the years 1999-2003, he testified:  "I don't know."  Id., 328:7-10, Doc. No. 257-12 at 46-47.  When asked for the the basis of that belief, he testified:  "That they weren't representative of what was going on at the company, no controls."  Id., 328:11-15, McEvilly Decl., Ex. 3, Doc. No. 274-3 at 42.  When asked how he came to that conclusion, he testified:  "One was indicated by the findings of independent investigation and the examiner's report and – and, I mean . . . . That was it."  Id., 328:16-329:1.

15.     When asked whether he relied on "anything other than the Examiner's Report to say that "any financial statement of DVI's was misstated," Pokrzywinski testified:  "That would

– that would, I think generally, it would be between the attorney and myself." Nov. 6, 2007 Pokrzywinski Dep., 329:2-22, McEvilly Decl., Ex. 3, Doc. No. 274-3 at 42.

16. When asked whether he ever investigated the accuracy of DVI's financial statements when the Plaintiff Funds were investing in DVI's bonds during the period, July of 1999 to July of 2003, Pokrzywinski testified: "No. We relied on the financial statements." Nov. 6, 2007 Pokrzywinski Dep., 327:5-9, 326:14-327:9, Friedman Aff., Ex. BB, Doc. No. 257-12 at 45-46. See also Def. Cohn's SOF ¶ 107 (He could not recall why he purchased and sold DVI's bonds during that time period).

17. Pokrzywinski read and relied generally on DVI's financial statements, including its SEC filings, in deciding to invest in DVI's bonds. Nov. 6, 2007 Pokrzywinski Dep., 198:2-23, 327:5-9, 348:20-349:19, Friedman Aff., Ex. BB, Doc. No. 257-12 at 38, 45-46, 50. Def. Cohn's SOF ¶ 106.

18. In the mid-1980s, Cohn reviewed analyses of credit applications that had been submitted to DVI requesting loans, and he decided to invest in the company. Feb. 12, 2008 Cohn Dep., 96:1-97:4, 109:15-110:14, Friedman Aff., Ex. A, Doc. No. 257-4 at 5-6, 9.

19. In the 1980s, Cohn invested $200,000 in DVI's preferred and common stock, and $50,000 in equity in DVI. Thereafter, he and his daughter, Cynthia Cohn, invested more in DVI's stock and bonds. They never sold any of their shares, except for 10,000 shares that Cohn had acquired by exercising stock options. He also invested $800,000, and his family's charitable foundation invested another $200,000, in DVI bonds that were due in June, 2002. At the request of DVI's senior management in July, 2001, Cohn agreed to extend the maturity date of those bonds to June, 2004. During DVI's bankruptcy, the Cohns lost "nearly the full amount" invested – about $2,320,000. Def. Cohn's SOF ¶¶ 2-3, 8-13.

14

20.     Cohn was a director on DVI's Board of Directors from about 1986 until sometime

after August 25, 2003.  He was a member of the Board's credit committe from its inception about

1988 "[t]ill the end" of DVI.  He was on the Board's audit committee from about 1998 until

December 31, 1999, and for some time, on its committee that determined compensation for

senior management.  Feb. 12, 2008 Cohn Dep., 96:1-98:8, 103:5-104:12, 134:17-136:5, 287:3-4,

Friedman Aff., Ex. A, Doc. No. 257-4 at 5-7, 11, 28.  Def. Cohn's SOF ¶¶ 14-15, 29, 30.

21.     During Cohn's tenure on the audit committee, Deloitte never informed the

committee that DVI's financial statements were unsound or unreliable, or that DVI had problems

in regard to compliance with its loan covenants, inadequate loan loss reserves, financial

reporting, the integrity of its management, or any other fraudulent activity alleged in this

litigation.  Jan. 15, 2008 Richard E. Miller Dep. 140:10-141:6, Friedman Aff., Ex. D, Doc. No.

257-5 at 22-23; Feb. 6, 2008 Nathan Shapiro Dep., 140:19-23, 161:15-162:2, Friedman Aff., Ex.

E, Doc. No. 257-5 at 34, 38; Feb. 20, 2008 William S. Goldberg Dep., 151:22-152:4, Friedman

Aff., Ex. F, Doc. No. 257-6 at 3-4; Feb. 21, 2008 Goldberg Dep., 456:12-457:13, Friedman Aff.,

Ex. G, Doc. No. 257-6 at 24-25; Feb. 12, 2008 Cohn Dep., 180:10-181:20, Friedman Aff., Ex. A,

Doc. No. 257-4 at 18-19; Feb. 14, 2008 Cohn Dep., 661:2-663:2, Friedman Dep., Ex. C, Doc.

No. 257-5 at 5.  Def. Cohn's SOF ¶¶ 16-17.

22.     Deloitte's "management letters" identified issues to be addressed by DVI's Board

and management.  The letters were distributed to the Board's directors.  During Cohn's tenure on

the audit committee, Deloitte did not present any issues related to the soundness of DVI's

financial reporting.  Feb. 6, 2008 Shapiro Dep., 136:4-137:17, 139:18, Friedman Aff., Ex. E,

Doc. No. 257-5 at 30-31, 33-34.  Def. Cohn's SOF ¶ 18.

23.     Cohn was not an officer of DVI.  He had no formal management or operating responsibilities; his official duties were those of a director and a member of the Board's credit committee for most of his tenure at DVI.  He did not have an office or a secretary at DVI.  Feb. 12, 2008 Cohn Dep., 107:8-18, 210:4-7, 210:21-211:5, 213:20-23, Friedman Aff., Ex. A, Doc. No. 257-4 at 8, 21, 22.  Def. Cohn's SOF ¶ 30.

24.     At times, Cohn was a salaried employee of DVI:  "I can't tell you the exact time. I can – it was when I was spending between forty and fifty hours a week at it."  Feb. 12, 2008 Cohn Dep., 112:6-14, Friedman Aff., Ex. A, Doc. No. 257-4 at 9.

25.     Cohn testified:  "I was always available to use whatever contacts I had for the benefit of shareholders. . . . I'm an old guy, and I know a lot of people and a lot of good people." Feb. 12, 2008 Cohn Dep., 183:6-21, Friedman Aff., Ex. A, Doc. No. 257-4 at 19.

26.     When asked whether he ever assisted DVI in "obtaining access to the capital markets," Cohn testified:

> I did. . . . Well, at one point I was asked to see if I couldn't help the company sell some BB notes.  BB notes are a part of securitization.  And I was asked if I knew anyone that could buy BB notes.  So, I said I thought I might.  And I took O'Hanlon – I don't know who else was there – to Dallas, Texas where we met with the president of Highland Capital who I knew.

Feb. 12, 2008 Cohn Dep., Friedman Aff., Ex. A, 184:7-20, Doc. No. 257-4 at 19.

27.     Prior to formation of the Board's credit committee, Cohn reviewed every proposal for a loan to be made by DVI.  Feb. 12, 2008 Cohn Dep., 107:20-22, 110:21-111:19, Friedman Aff., Ex. A, Doc. No. 257-4 at 8-9.  Cohn testified:  "I was shown every credit before it was approved, and I gave my opinion on each one."  Id., 111:3-6.  Def. Cohn's SOF ¶ 19.

28.     In 1988, DVI hired Anthony J. Turek, who became an Executive Vice President and Chief Credit Officer of DVI as well as the head of the Board's credit committee, which included four other members.  Jan. 24, 2008 Turek Dep., 21:11-13, 22:8-13, 23:17-24:2, Friedman Aff., Ex. H, Doc. No. 257-6 at 28; Feb. 12, 2008 Cohn Dep., 114:3-115:4, 153:8-19, Friedman Aff., Ex. A, Doc. No. 257-4 at 10, 16.  Def. Cohn's SOF ¶¶ 19-20.

29.     Cohn testified that during his tenure on the credit committee, every application for credit that exceeded a certain limit should have been submitted to him for review:

> I don't know that it [a credit policy] was ever in writing, . . . but I took it as – as the way the procedure should take place. . . . We had a limit that I didn't look at, and I can't remember what it was.  But everything over the limit was to come to me.

Feb. 12, 2008 Cohn Dep., 111:8-19, Friedman Aff., Ex. A, Doc. No. 257-4 at 9.

30.     The credit committee reviewed all domestic loans in the amount of $1 million or more.  Feb. 12, 2008 Cohn Dep., 138:12-139:16, Friedman Aff., Ex. A, Doc. No. 257-4 at 12. "This threshold was lower in the early years, but increased to $1 million as the credit process was improved under Mr. Turek and the volume of loans grew."  Def. Cohn's SOF ¶ 21.

31.     The credit committee was responsible for new loans.  It was not responsible for "workouts" of troubled loans – for which DVI had a separate department.[16]  The record does not suggest that Cohn had any significant knowledge about or participation in the activities of the workout department.  Feb. 13, 2008 Cohn Dep., 380:19-381:19, 383:5-9, Friedman Aff., Ex. I, Doc. No. 257-7 at 13-14.  See Def. Cohn's SOF ¶¶ 22, 31-33 (workouts of problematic loans).

---

[16]  Defendant Matthew Colasanti – an internal consultant for DVI who managed its loan "workout group" testified:  "The [workout] process is a result of a borrower . . . becoming past due in his payments."  Oct. 2, 2007 Colasanti Dep., 46:1-4, Def. Ex. 7, Doc. No. 259-9 at 4.  "[The workout process] is, simply put, to try to cure the ills of the borrower, to get it back into a paying mode.  We wanted our money back.  And [the five members of the  workout group] took the responsibility of the strategy and carrying out the strategy to get that money back."  Id., 44:2-21, 53:8-14, Def. Ex. 7, Doc. No. 259-9 at 3, 7.

32.     The credit committee focused on a loan applicant's ability to repay a loan.  This determination was made based on information that was gathered by DVI's credit department and provided to the committee in a "credit book."  See Def. Cohn's SOF ¶¶ 23-24 (describing the types of information compiled and the committe's loan approval procedures).

33.     As to each loan to a single borrower, DVI had a policy that required credit committee approval of additional extensions of credit if the total amount financed reached $1 million or more – even if the additional credit was an arrangement structured by DVI's workout department.  Jan. 28, 2008 Michael A. O'Hanlon Dep., 117:22-118:9, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. B, Doc. No. 683-4 at 45; Feb. 13, 2008 Cohn Dep., 389:13-390:5, 431:23-432:8, Friedman Aff., Ex. I, Doc. No. 257-7 at 16, 24; Feb. 14, 2008 Cohn Dep., 820:11-822:16, Friedman Aff., Ex. C, Doc. No. 257-5 at 12-13. Def. Cohn's SOF ¶ 22.

34.     Cohn did not know of any occasions on which O'Hanlon or Richard E. Miller – an Executive Vice President of DVI and President of DVI FS – decided to make a loan without the credit committee's approval.  Neither O'Hanlon nor Miller had the authority to do so. Neither had the authority to overrule a loan decision made by the credit committee.  Feb. 12, 2008 Cohn Dep., 141:11-143:1, Friedman Aff., Ex. A, Doc. No. 257-4 at 13; Feb. 13, 2008 Cohn Dep., 424:9-427:22, Friedman Aff., Ex. I, Doc. No. 257-7 at 22-23.  Def. Cohn's SOF ¶ 25.

35.     With one exception, Cohn did not know about any DVI loans in excess of $1 million that had been made without the credit committee's approval.  Feb. 13, 2008 Cohn Dep., 415:1-417:21, 431:23-432:8, Friedman Aff., Ex. I, Doc. No. 257-7 at 20-21, 24; Feb. 14, 2008 Cohn Dep., 820:9-824:6, Friedman Aff., Ex. C, Doc. No. 257-5 at 12-13.  Def. Cohn's SOF ¶ 26.

36.     That one exception was a workout loan made in 2003 in excess of $1 million to

Intrepid U.S.A., Inc. without credit committee approval.  Cohn learned about this "just by

accident."  Feb. 13, 2008 Cohn Dep., 388:4-389:7, Friedman Aff., Ex. I, Doc. No. 257-7 at 15-

16; Apr. 1, 2008 Steven R. Garfinkel Dep., 52:13-53:22, Friedman Aff., Ex. J, Doc. No. 257-7 at

42.  Def. Cohn's SOF ¶ 27.

37.     Steven R. Garfinkel – DVI's Chief Financial Officer – testified that Cohn

presented his concerns about the Intrepid loan at a Board meeting:

| | |
|---|---|
| Garfinkel: | I remember at the board Jerry was very upset. |
| | *     *     * |
| Q. | What do you remember him saying? |
| Garfinkel: | Saying that's not allowed and this has to stop. |
| Q. | And to whom did he say that? |
| Garfinkel: | I thought it was O'Hanlon. |
| Q. | And what did O'Hanlon respond, if anything? |
| Garfinkel: | He said we are not going to do it anymore.  But that was also in the response in the management letter [authored by Deloitte and distributed to the board members]. |
| | *     *     * |
| Garfinkel: | . . . Mr. Cohn was upset that things wouldn't go through the credit committee. |

Apr. 1, 2008 Garfinkel Dep., 52:13-53:22, Friedman Aff., Ex. J, Doc. No. 257-7 at 42.

38.     Prior to the Intrepid loan, Deloitte never communicated to the Board that officers

of the company were making loans, either initially or in the aggregate, over a million dollars

without the credit committee's approval.  Cohn testified:  "I had never heard that."  Feb. 14, 2008

Cohn Dep., 695:2-11, Friedman Aff., Ex. C, Doc. No. 257-5 at 6.  Def. Cohn's SOF ¶ 28.

39.     In March of 2001, Lisa Cruikshank – Vice President, Treasury of DVI FS –

resigned.  Shortly before she did so, Cohn called Garfinkel and asked why she was leaving.

According to Cohn, their conversation was as follows:

> And I said, "I understand that Lisa Cruikshank is leaving." I never talked to
> her, but I heard she was a good employee. So I asked him [Garfinkel] that. He said,
> "well, she feels uncomfortable about signing the collateral sheet and so forth." And
> I said, "What do you mean?"
>
> And he started telling me that . . . we go in and out of compliance. A lot it
> has to do with the securitization and so forth. And I said, "Well, I want you – are you
> in compliance now?" And he said, "Yeah, I'm in compliance." I said, "Are you
> going to stay in compliance?"
>
> "Well, we go in and out." I said, "Look, you've got to stay in compliance.
> You've just got to stay in compliance." So, I said, "Do me a favor. Have Lisa
> Cruikshank call me." He said, "Okay, but I'm going to convince her to stay."

Feb. 12, 2008 Cohn Dep., 289:6-290:5, 288:15-290:5, Friedman Aff., Ex. A, Doc. No. 257-4 at

28-29. See Def. Cohn's SOF ¶ 42 ("Cruikshank felt uncomfortable signing compliance reports

submitted to DVI's lenders because DVI had not always been in compliance with the Fleet loan

agreement in the past – that DVI 'went in and out of compliance.'"); id. ¶¶ 43-44.

40.     During that conversation, according to Garfinkel: "He [Cohn] said, 'We can't be

doing that. We can't – we can't be out of compliance.' And I took that to mean he would talk to

O'Hanlon." Mar. 27, 2008 Garfinkel Dep., 34:23-35:6, Friedman Aff, Ex. P, Doc. No. 257-11 at

14. See also Apr. 1, 2008 Garfinkel Dep., 83:16-84:16, Friedman Aff., Ex. J, Doc. No. 257-7 at

44 ("it was an acknowledgment, yeah, I know we can't, but – but. . . . but what was unsaid was,

but we are").

41.     Cruikshank did not contact Cohn. He testified that during a follow-up telephone

conversation with Garfinkel:

> And I said, "I didn't hear anything from her, from Lisa." He [Garfinkel] said,
> "Well, I think I got her to stay." That was about two weeks later. Then I called
> again and I asked him again and he said, "Well, she already left."

Feb. 12, 2008 Cohn Dep., 291:16-23, Friedman Aff., Ex. A, Doc. No. 257-4 at 29. Cruikshank

testified that "Garfinkel asked me not to speak to him [Cohn]." Aug. 21, 2007 Cruikshank Dep., 239:4-240:23, Friedman Aff., Ex. Q, Doc. No. 257-11 at 21. Def. Cohn's SOF ¶ 45.

42.     Cohn spoke with O'Hanlon about the "out-of-compliance problem." According to Cohn, their conversation was as follows:

> In the meantime, I picked up the phone and called O'Hanlon. I said, "Mike, this is just what happended here. And apparently Lisa Cruikshank is thinking of leaving, and I'm concerned about it, but I am more concerned about the fact that Garfinkel tells me that we're not in compliance.
>
> He said, "You're making a mountain out of a molehill." He said, "I'm telling you it's like overdrawing your checking account," . . . .
>
> So I said, "You might think it's just like overdrawing a bank account, but I don't take that position, and I want your promise that every quarter that you – that I – I'm going to call you every quarter and that you, in fact, make sure that we are in compliance."

Feb. 12, 2008 Cohn Dep., 290:6-291:3, 288:15-291:12, Friedman Aff., Ex. A, Doc. No. 257-4 at 28-29. Def. Cohn's SOF ¶ 46.

43.     The record does not contain any evidence that O'Hanlon or Garfinkel – or anyone else – told Cohn that the compliance issue that prompted Cruikshank's resignation related to the use of ineligible collateral to support extensions of credit by DVI's lenders, double-pledging the same collateral used to support one loan to support other loans issued by different lenders, or any other deceptive conduct. Def. Cohn's SOF ¶ 47.

44.     Garfinkel testified that he told Cohn: "I did say we were out of compliance. And Jerry [Cohn] said we can't be, that's a situation that can't exist. But I didn't use the word ineligible collateral." Apr. 1, 2008 Garfinkel Dep., 82:12-83:15, Friedman Aff., Ex. J., Doc. No. 257-7 at 44. Def. Cohn's SOF ¶ 47.

45.     According to Cohn, Garfinkel explained what he meant by saying "they went in and out of compliance":

> – that sometimes there's a delay on the part of the underwriter to execute the – the sale of the securitization, and it's in that delay that causes an imbalance on the cash and the collateral, and that's why, as he [Garfinkel] said, it swung in and swung out.

Feb. 12, 2008 Cohn Dep., 812:16-814:5, Friedman Aff., Ex. C, Doc. No. 257-5 at 10-11.

"Garfinkel explained the issue as solely one of timing, and made no mention of any violation of the loan covenants governing what collateral could be pledged." Def. Cohn's SOF ¶ 48.

46.     Cohn testified that he did not understand that "out of compliance" meant the use of ineligible collateral – such as loans to DVI's customers that were delinquent typically for more than 60 days – to support extensions of credit by DVI's lenders:

> Q.     When Mr. Garfinkel said that they were in and out of compliance, did you have an understanding that one of the ways they were sometimes out of compliance was by failing to immediately replace delinquent collateral [typically, loans delinquent for more than 60 days] in the borrowing base?
>
> Cohn:   No.  That was not my understanding.

Feb. 12, 2008 Cohn Dep., 815:4-12, 814:9-815:12, Friedman Aff., Ex. C, Doc. No. 257-5 at 10-11.

47.     Prior to mid-July or early August of 2003, the record does not suggest that Cohn knew or should have known that DVI had violated covenants in its loan agreements with Fleet Bank or any other lenders by listing ineligible collateral to support the extension of credit and loans to DVI, or by any other allegedly deceptive conduct.  See Def. Cohn's SOF ¶¶ 39, 40, 49-62.  See also Jan. 28, 2008 O'Hanlon Dep., 57:1-61:18, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. B, Doc. No. 683-4 at 42-43; Mar. 26, 2008 Garfinkel Dep., 257:4-264:12, Friedman Aff., Ex. N, Doc. No. 257-11 at 6-8; Apr. 1, 2008 Garfinkel Dep., 97:2-100:7, 130:6-132:10, Friedman Aff., Ex. J, Doc. No. 257-7 at 45-46, 50

(Garfinkel never showed Cohn loan covenant compliance schedules that were given to DVI's

lenders); Feb. 13, 2008 Cohn Dep., 344:10-22, Friedman Aff., Ex. I, Doc. No. 257-7 at 8; Feb.

14, 2008 Cohn Dep., 917:17-918:18, 931:1-20, Friedman Aff., Ex. C, Doc. No. 257-5 at 18-19.

     48.    Cohn testified:

Q.    Did you know in 2001 that ineligible collateral had been pledged to any DVI lender?

Cohn:  Never.

Q.    Did you know in 2001 that any collateral had been double pledged to any DVI lender?

Cohn:  No.

Q.    . . . Did you know in 2001 that any officer of DVI had committed fraud of any kind?

Cohn:  No.

Q.    When did you first learn any of those facts, if they are facts?

Cohn:  I first really – first learned when I met on the – on the morning of August 4th with John Boyle [DVI's Vice President, Chief Accounting Officer, and Secretary] and started to read the Susan Gibson letter [discussed below].

*    *    *

Q.    Did you know in 2001 that any person at DVI had committed fraud?

Cohn:  No.

Feb. 14, 2008 Cohn Dep., 931:1-932:7, Friedman Aff., Ex. C, Doc. No. 257-5 at 19.

     49.    The record contains ample evidence that during the pertinent time period, DVI's

senior management assured the Board and Cohn, in particular, that DVI was in substantial

compliance with its loan agreements and its loan loss reserves were adequate, and that any

infractions of DVI's loan covenants had either been cured or were excusable at the option of the

lender within the course of ordinary business practices – and without significant adverse

consequences to DVI.  See Def. Cohn's SOF ¶¶ 49-51, 53-60, 63.

50.     DVI's senior management testified about different consequences that might ensue from infractions of different types of loan covenants – in their view, not every violation of a covenant resulted in an incurable default:  Feb. 14, 2008 Cohn Dep., 917:22-918:18, Friedman Aff., Ex. C, Doc. No. 257-5 at 18; Mar. 31, 2008 Garfinkel Dep., 257:4-264:12, 294:3-296:8-18, Friedman Aff., Ex. U, Doc. No. 257-11 at 6-8, 43; Apr. 1, 2008 Garfinkel Dep., 9:3-16, Friedman Aff., Ex. J, Doc. No. 257-7 at 39.  Def. Cohn's SOF ¶¶ 39, 55-56.

51.     The record does not contain any evidence that anyone told Cohn that DVI had serious problems with liquidity or inadequate loan loss reserves.  He did not hear that from O'Hanlon, Garfinkel, or anyone else in senior management, and he did not hear it from Deloitte.  Feb. 12, 2008 Cohn Dep., 303:1-307:23, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. A, Doc. No. 683-4 at 35-36.  Def. Cohn's SOF ¶ 63.

52.     At an April 10, 2001 meeting of the Board, Cohn asked DVI's senior management "are we in or out of compliance?"  Mar. 27, 2008 Garfinkel Dep., 43:18-23, Friedman Aff., Ex. P, Doc. No. 257-11 at 16.  Garfinkel responded:  "we might be in compliance at the end of this quarter, but we are definitely not in compliance in between.  And . . . [w]e drift in and out of compliance . . . ."  Id., 44:20-45:4.  Garfinkel recalled that O'Hanlon "jumped in and said":

> I will answer this question.  I will answer this question, Steve. . . . We are not in compliance.  It is a problem.  Just about every big company is not in compliance.  This is not a big deal. . . . I'll address it.  I said I will get it fixed.  Let's just stop talking about this.

Id., 45:15-46:19, Doc. No. 257-11 at 16-17.  That was the end of the conversation.

53.     Garfinkel testified:

> I thought it was always sufficient that the board understand we were very short on cash and did not necessarily know that we had to go to negative cash . . . .

Mar. 27, 2008 Garfinkel Dep., 44:7-11, 42:16-46:19, Friedman Aff., Ex. P, Doc. No. 257-11 at 16-17.

54.     Garfinkel testified that the Board "certainly did not understand that I was using ineligible collateral." Mar. 27, 2008 Garfinkel Dep., 51:12-21, Friedman Aff., Ex. P, Doc. No. 257-11 at 18. See also Mar. 31, 2008 Garfinkel Dep., 40:2-11, Friedman Aff., Ex. U, Doc. No. 257-11 at 40; Apr. 1, 2008 Garfinkel Dep., 97:2-100:7, Friedman Aff., Ex. J, Doc. No. 257-7 at 45-46.

55.     At a special meeting of the Board in 2002, Cohn again questioned DVI's senior management about loan compliance. Garfinkel explained that DVI was not in compliance on its debt with Fleet Bank "because of the Argentina currency dropping so precipitously, dropping down," but "[h]e felt that he could get Fleet to give us an exemption there . . . ." Feb. 13, 2008 Cohn Dep., 337:4-21, Friedman Aff., Ex. I, Doc. No. 257-7 at 7. Cohn asked Garfinkel specifically which covenant had been broken, and Garfinkel "said it was the cash flow covenant because of the currency." Id., 337:18-21; see Def. Cohn's SOF ¶ 55 (because "DVI was not receiving sufficient repayments on its Argentinean loans to satisfy the cash flow to debt ratio required under the agreement"). Cohn then asked Garfinkel "are we out of compliance with any other covenant in the Fleet borrowing agreement?" Garfinkel said, "no." Id., 338:4-11. See Def. Cohn's SOF ¶¶ 54-57.

56.     At a meeting of the Board in December of 2002, Cohn asked Garfinkel "are we in full compliance with all the bank covenants?" Garfinkel said, "yes." Feb. 13, 2008 Cohn Dep., 342:12-344:3, Friedman Aff., Ex. I, Doc. No. 257-7 at 8; Def. Cohn's SOF ¶ 58.

57.     Cohn testified:

Cohn:   [A]nd never once did Steve Garfinkel ever say to me that – that he's out of money and he – and he's cooking the books.  Never once.

Q.      . . . Did Michael O'Hanlon ever say to you that the company was out of money?

Cohn:   Never.

Q.      Did anybody from senior management . . . ever say to you that we're out of money?

Cohn:   I didn't hear it from anyone.

Q.      Did Deloitte & Touche ever say to you as a member of the board of directors this company is out of money?

Cohn:   Never.
                            *        *        *
Q.      Did Mr. Garfinkel ever tell you that DVI's reserves were understated?

Cohn:   No.

Q.      Did Mr. O'Hanlon ever tell you that DVI's reserves were understated?

Cohn:   Never.

Feb. 12, 2008 Cohn Dep., 305:6-306:1, 306:20-307:2, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. A, Doc. No. 683-4 at 36.

58.     Garfinkel testified:  "I did not tell him [Cohn] that we were out of cash."  Apr. 1, 2008 Garfinkel Dep., 23:13- 24:12, Friedman Dep., Ex. J, Doc. No. 257-7 at 40.  See also Apr. 1, 2008 Garfinkel Dep., 121:20-123:19, filed at In re DVI, Inc. Sec. Litig., No. 03-5336, Def. Cohn's Mot. Summ. J., Friedman Aff., Ex. J, Doc. No. 683-7 at 6-7 (Garfinkel:  "they [the Board] did not know that we were negative cash" until August of 2003).

59.     In April or May of 2003, Garfinkel sent a lengthy memorandum to O'Hanlon that directly evidences Cohn's state of mind at that time.  Garfinkel stated in part:

At our last dinner I tried to convey a growing sense of concern that we had reached an untenable cross roads for the company.  We are no longer talking about a small

26

problem. We are at a point where the viability of the company can be legitimately questioned. The personal exposure to our Board, you and me is real, serious and large.

*     *     *

It had been frustrating sitting in on Board decisions and conversations about raising capital or selling businesses and assets that I know would have had a different answer with a fuller disclosure of the company's liquidity situation. Unfortunately, these same kind of misguided conversations continue today only reinforcing what should be a great deal of discomfort for you, Rich and myself. You and I both have to cringe when Jerry [Cohn] talks about using the cash from the overseas operations to retire the senior notes and dismisses having to raise capital.

*     *     *

I cannot even think through the prospects of letting the Board members proceed with the exchange and capital raising issues with no awareness whatsoever of the risks they are exposed to.

April or May, 2003, Garfinkel mem. at 1, 5, Friedman Aff., Ex. V, Doc. No. 257-11 at 47, 51; Def. Cohn's SOF ¶¶ 60, 61, Doc. No. 257-2 at 19 & n.1. As to surrounding circumstances, <u>see also</u> Mar. 31, 2008 Garfinkel Dep., 326:12-330:19, Friedman Aff., Ex. U, Doc. No. 257-11 at 44-45 ("And there had to have been massive lies on the part of O'Hanlon . . . . I just never expected him . . . to probably have badly lied to the board . . . ."); Apr. 1, 2008 Garfinkel Dep., 141:18-143:3, Friedman Aff., Ex. J, Doc. No. 257-7 at 51-52 ("I think he betrayed the board on certain representations. And, yes, I think he would flat out lie to Mr. Cohn . . . .").

60. As a director on the Board, Cohn relied on Deloitte's auditing services and its unqualified audit opinions of DVI's financial statements. Def. Cohn's SOF ¶¶ 73-76, 77-82.

61. The record does not contain any evidence that Cohn was ever informed by Deloitte that DVI's financial statements were not sound or reliable, or that the company had serious problems in regard to compliance with its loan covenants, inadequate loan loss reserves, financial reporting, the integrity of its management, or any of the other fraudulent activity alleged in this litigation. Def. Cohn's SOF ¶ 75 (collecting testimony); <u>see also</u> Feb. 12, 2008 Cohn

Dep., 178:16-22, Friedman Aff. Ex. A, Doc. No. 257-4 at 18 ("Never" had any discussions with anybody from Deloitte about DVI's loans); Feb. 14, 2008 Cohn Dep., 694:16-22, Friedman Aff., Ex. C, Doc No. 257-5 at 6 ("Absolutely" relied on Deloitte to evaluate DVI's internal controls).

62.     Perhaps as early as mid-July, 2003, but no later than August 4, 2003, Cohn had notice that DVI's loan compliance problems were serious and substantial, and might be attributable to intentional misconduct by someone at DVI – perhaps its senior officers. Specifically, he then became aware for the first time that there was a $50 million shortfall in eligible collateral to support DVI's debt, and there had been an improper transfer of $44 million of DVI collateral to another lender, Merrill Lynch, that deprived Fleet Bank of collateral.  Feb. 12, 2008 Cohn Dep., 262:4-11, 264:16-20, 266:7-267:2, 269:17-275:4, Friedman Aff., Ex. A, Doc. No. 257-4 at 24-27; Feb. 13, 2008 Cohn Dep., 344:10-22, Friedman Aff., Ex. I, Doc. No. 257-7 at 8; Feb. 14, 2008 Cohn Dep., 808:22-810:14, 910:3-912:10, 929:23-932:7, Friedman Aff., Ex. C, Doc. No. 257-5 at 9-10, 19; Feb. 21, 2008 Goldberg Dep., 398:16-400:13, Friedman Aff., Ex. G, Doc. No. 257-6 at 20-21.  See Def. Cohn's SOF ¶¶ 83-91, 97, 99.

63.     Cohn testified that on August 4, 2003, he read a whistle-blower letter that had been sent to DVI one week earlier from Susan Gibson – a DVI employee, addressed to John P. Boyle – DVI's Chief Accounting Officer.  Cohn testified:  "We read the Susan Gibson letter, and it was the first time I knew sure shot that some – somebody was cooking the books because it was obvious from that letter that that's what happened."  Feb. 12, 2008 Cohn Dep., 259:3-261:20, Friedman Aff., Ex. A, Doc. No. 257-4 at 24.

64.     After reading the Gibson letter on August 4, 2003, Cohn investigated what he perceived to be potential wrongdoing by others at DVI.  See Def. Cohn's SOF ¶¶ 92-104.  Once

28

he determined that he could not cure DVI's liquidity crisis – as he phrased it, that lenders had "throttled our liquidity" – he "pushed to put the company into bankruptcy because [he] felt an obligation then to the creditors." Feb. 13, 2008 Cohn Dep., 365:2-366:12, Friedman Aff., Ex. I, Doc. No. 257-7 at 12. Cohn succeeded in that effort within three weeks after reading the Gibson letter. On August 13, 2003, DVI announced its intention to file for bankruptcy protection, and on August 25, 2003, DVI, DVI FS, and DVI BC each filed separate Chapter 11 petitions.

III.    DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). This requires "affirmative evidence . . . from which a jury might return a verdict in his favor." Id. at 257; Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (must set forth specific facts showing the existence of a genuine issue for trial); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (ruling that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial") (citation and internal quotation marks omitted)).

After adequate time for discovery, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. The moving party discharges its burden by "showing – that is,

29

pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." Id. at 325. If the movant succeeds in doing so, there can be no genuine triable disputes because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323-25.

A.      Section 10(b) and Rule 10b-5 Claims

Plaintiffs have the burden of proving at trial their reliance upon a misrepresentation or omission of material fact by the defendant and that defendant's scienter, *i.e.*, wrongful state of mind – elements for proof in any private action under Section 10(b) and Rule 10b-5. Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008) ("essential" elements); accord Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 n.3 (U.S. 2011); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available") (citation and internal quotation marks omitted)); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976) (negligent conduct is not sufficient – Section 10(b) proscribes "knowing or intentional misconduct" or "willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities").

Considering the record as a whole together with the facts submitted by the parties here, there are no triable disputes as to any of the essential elements of a private securities fraud action. Importantly, the record contains no evidence of the requisite reliance upon a material misrepresentation or omission and a wrongful state of mind on the part of Cohn.

Under Rule 10b-5(a) and (c), respectively, it is unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(a), (c). To impose this scheme liability upon Cohn, it must be shown that the Plaintiff Funds knew about or relied on deceptive conduct by Cohn that was publicly disclosed at the time they purchased or sold DVI's securities. See Stoneridge, 552 U.S. at 166-67 (holding that the investing public could not have relied on undisclosed deceptive acts). But the record is devoid of such evidence – and none of the alleged misconduct was ever publicly attributed to Cohn.

Under Rule 10b-5(b), it is unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). Plaintiffs say that during the pertinent time period, Cohn signed DVI's annual From 10-K and quarterly Form 10-Q filings with the SEC. But the record does not contain any of the cited documents that are said to exhibit Cohn's signature. The record is devoid of evidence of a false or misleading public statement made by Cohn, and none of the alleged misstatements was publicly made by or attributed to Cohn – with one qualification. Cohn may have signed at least some of DVI's annual Form 10-Ks that were filed with the SEC. By doing so, Plaintiffs say, Cohn made alleged misstatements contained in those documents.

Resolving all reasonable inferences in favor of the non-movant Plaintiff Funds, as must be done in evaluating summary judgment, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); accord Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 772 (3d Cir. 2013), it appears that Cohn acknowledges signing at least some of DVI's annual Form 10-K filings with the SEC for DVI's fiscal years ended June 30, 1999 through June 30, 2002.

31

However, the record contains no evidence supporting an inference that Cohn signed any of DVI's other SEC filings as cited by Plaintiffs.

The issue then becomes whether Cohn – solely by signing DVI's Form 10-K filings – "made" any actionable misstatements under the rule adopted by the Supreme Court in Janus:

> [T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it. Without such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement.

131 S. Ct. at 2303. "And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed." Janus, 131 S. Ct. at 2302 & n.6 ("the maker is the person or entity with ultimate authority over a statement and others are not"). Under Janus, several questions are presented as to whether Cohn made any public statements by signing DVI's SEC filings. Namely, whether by doing so, Cohn delivered Deloitte's unqualified audit opinions and DVI's financial statements to the investing public and thereby took credit – or blame – for what was ultimately said in those documents. Or, whether he adopted the documents as his own or exercised sufficient authority and control over their content to be held liable for making any false or misleading statements contained in them.

On this record, Cohn made some public statements – by endorsing for delivery to the investing public the same statements that Deloitte made with its unqualified audit opinions of DVI's financial statements. But Cohn cannot be held liable for what was said in those documents based on his signature alone. He did not have authority over the statements contained in them, and whether and how to communicate them. DVI's accountants prepared the financial statements, and its senior management made the final decision to file them with the SEC, and Deloitte had the ultimate authority to issue its audit opinions that were included in the filings.

The record also shows that Cohn justifiably relied on Deloitte's auditing services and unqualified audit opinions. He was never informed by Deloitte or DVI's senior management that the financial statements were unsound or unreliable, or that DVI was engaged in the fraudulent activity alleged in this litigation. No evidence has been proffered that suggests Cohn had any information, knowledge, or reason to question whether DVI's financial statements or Deloitte's audit opinions were misstated. There is no evidence that the audit opinions or financial statements suggested – on their face or under the circumstances surrounding their presentation to the Board – that they could not be relied on without further inquiry. For any of DVI's Form 10-K filings that Cohn may have signed, this record shows that he did so with an honest belief that the statements contained in those documents were sound and reliable.

Although Plaintiffs say that Cohn "was responsible for ensuring the accuracy of DVI's reported financial condition," Pls. Br., Doc. No. 272 at 4, this assertion is not supported with evidence. He was not a member of the Board's auditing committeee during the pertinent time period, and he had no special duties to inquire further into accounting and auditing matters. In this case, the record shows that he was in no better position to know more than the investing public and had no obligation to disclose what he did not know – that the audit opinions and financial statements might be questionable.

Importantly, reviewing the "record 'taken as a whole,'" as is also required in evaluating summary judgment, Reeves, 530 U.S. at 150-51 (quoting Matsushita, 475 U.S. at 587), Cohn may have made a statement, but even if he did, there is no evidence that it was false, misleading, or otherwise deceptive. This is so because Plaintiffs' position only assumes that Deloitte's audit opinions and DVI's financial statements were false and misleading at the time they were filed

with the SEC.  See WM High Yield Fund, No. 04-3423, 2013 WL 3230667, at *4-7, 10, 13-14.

And it also assumes that Cohn knowingly signed Form 10-K filings that included misstated audit

opinions and financial statements.  But proof must be made as to each defendant.

In deciding to invest in DVI's bonds during the pertinent time period, Plaintiffs read and

relied generally on DVI's public financial statements, including its filings with the SEC.  They

mistakenly disclaim a requirement to show that some portion of DVI's annual financial

statements makes Deloitte's unqualified audit opinions materially inadequate, incomplete, false,

misleading, or deceptive.  See WM High Yield Fund, 2013 WL 3230667, at *7, 10 (they also err

in disclaiming the requirement to establish a decline in the market price of DVI's securities that

was caused by Deloitte's conduct or statements); see also Pls. CSOF ¶ 13, Doc. No. 267 at 6-7

(denying the necessity to do so because a "stunning and pervasive pattern and practice of fraud"

at DVI rendered "all" of its financial statements "materially misstated and false," and [b]y

definition," "rendered Deloitte's unqualified audit opinions false").  Similarly here, Plaintiffs

have not shown that any portion of Deloitte's unqualified audit opinions or DVI's financial

statements makes Cohn's signature on the SEC filings at issue materially false or misleading at

the time that he may have signed those documents.[17]

_____

[17]  Plaintiffs assert that Cohn "does not dispute" that he signed DVI's Form 10-K and Form 10-Q filings "during each reporting period for the fiscal years 1999, 2000, 2001, 2002 and the first three quarters of 2003."  Pls. Br., Doc. No. 272 at 5-6.  They also assert that Cohn "does not dispute" that DVI's financial statements for each of these periods "were materially false and misleading with regard to DVI's true financial condition."  Id. at 6, 12.  Cohn is faulted for not "demonstrat[ing] that the financial statements . . . were not materially misstated."  Id. at 12.  These assertions do not create a genuine dispute.  Plaintiffs have the burden at trial to prove that Cohn made a misrepresentation or omission of material fact.  And as non-moving parties, they also have the burden of coming forward with that quantum of evidence required to withstand summary judgment as to this essential element of a Section 10(b) private action.  "A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

Without any evidence of a false or misleading statement that was publicly disclosed and attributed to the defendant – here, Cohn – reliance may not be presumed. Under the fraud-on-the-market doctrine, "reliance is presumed when the statements at issue become public." Stoneridge, 552 U.S. at 159. Public information is reflected in the market price of a security. Id. Only "[t]hen it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." Id. (citing Basic, 485 U.S. at 247).

In addition, reliance may not presumed here based on "an omission of a material fact by one with a duty to disclose." Stoneridge, 552 U.S. at 159. Plaintiffs suggest that Cohn, as one of the group of individual Defendants, owed investors a "duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition, operating performance, and prospects." Compl. ¶ 43; Pls. Br., Doc. No. 272 at 4 (proposing a duty to "ensur[e] the accuracy of DVI's reported financial condition"). Perhaps this is an invocation of a rebuttable presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972), although no further argument or evidence is provided. This presumption of reliance "is generally applicable only when material information is withheld from investors by a defendant having an affirmative duty of disclosure." In re DVI, Inc. Sec. Litig., 639 F.3d 623, 631 n.10 (3d Cir. 2011) (citing Affiliated Ute, 406 U.S. at 153-54; Stoneridge, 552 U.S. at 159), abrogated on other grounds, 133 S. Ct. 1184 (U.S. 2013)); see also id., 639 F.3d at 643 n.30 (discussing the unsuccessful assertion of such a duty to disclose as to Clifford Chance)

If so proposed, such a duty to disclose would be without merit. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, Inc., 485 U.S. at 239 n.17. Generally, "an affirmative duty arises only when there is insider trading, a statute requiring disclosure, or an

inaccurate, incomplete, or misleading prior disclosure." Winer Family Trust v. Queen, 503 F.3d 319, 329 (3d Cir. 2007) (citing Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000)). See also In re DVI Inc. Sec. Litig., No. 03-5336, 249 F.R.D. 196, 218 (E.D. Pa. 2008) (Davis, J.) ("Affiliated Ute presumption is equally inapplicable because Clifford Chance owed no duty of disclosure to DVI's investors") (citing Stoneridge, 552 U.S. at 159)), aff'd, 639 F.3d 623, 629, 643 n.30) (3d Cir. 2011). As to Cohn, no affirmative duty to disclose was ever pled. No applicable statute or case law is cited to support a finding that Cohn, individually, owed a duty to disclose information to investors. There is no evidence of an inaccurate, incomplete, or misleading prior disclosure attributable to Cohn. Cohn could not disclose what he did not know. On this record, Cohn had no duty to disclose.

Moreover, the Plaintiff Funds have not submitted evidence of reliance on any specific public statements made by Cohn – or any specific public statements made by Deloitte or DVI that were endorsed by Cohn. Each Plaintiff must prove "reliance on a fraudulent material misrepresentation or omission," Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154,174 (3d Cir. 2001), or reliance on the defendant's publicly disclosed, deceptive acts, Stoneridge, 552 U.S. 159, 160-64, 166-67. This includes proof that each was "aware of, and directly misled by, an alleged  misrepresentation," Semerenko v. Cendant Corp., 223 F.3d 165, 178 (3d Cir. 2000), and that such statement or conduct caused each "to engage in the transaction in question," Newton, 259 F.3d at 174 (citation and internal quotation marks omitted). This Plaintiffs have not done.

In addition, proof of the defendant's scienter is required in a private securities fraud action. Tellabs, 551 U.S. at 319 ("a private plaintiff must prove that the defendant acted with

scienter, 'a mental state embracing intent to deceive, manipulate, or defraud'") (quoting <u>Ernst &</u>
<u>Ernst</u>, 425 U.S. at 193-94)); <u>accord</u> <u>Belmont v. MB Inv. Partners, Inc.</u>, 708 F.3d 470, 493 (3d
Cir. 2013); <u>In re Ikon Office Solutions, Inc.</u>, 277 F.3d 658, 667 (3d Cir. 2002) ("or, at a
minimum, highly unreasonable conduct, involving not merely simple or even inexcusable
negligence, but an extreme departure from the standards of ordinary care, which presents a
danger of misleading buyers or sellers that is either known to the defendant or is so obvious that
the actor must have been aware of it") (alterations, citations, and internal quotation marks
omitted)). <u>Tellabs</u> requires that there must be a "strong inference" of scienter – "*i.e.*, a powerful
or cogent" inference based on the entire record, and "plausible opposing inferences" must be
taken into account. 551 U.S. 322-24.

Plaintiffs have adduced no such proof. On this record, no reasonable fact finder would
view the inference of scienter as compelling or convincing. Plaintiff's only evidence of scienter
is Cohn's position at DVI – buttressed by suppositions that as a director and member of the
Board's credit committee he "was heavily involved in DVI's daily operations," and he must have
known of the fraudulent scheme allegedly carried out at DVI. Pls. Br., Doc. 272 at 6, 8, 9.
This is not enough.

The record establishes that Cohn did not participate in the day-to-day management and
operations of DVI. Also, no intersection in fact has been shown between his duties, activities,
and transactions for DVI as compared to the fraud alleged here. <u>See</u> Compl. ¶ 6. His position as
a director and member of the credit committee – as well as his status as a substantial investor in
DVI and highly regarded colleague with valuable contacts in the capital markets for financing –
alone do not suggest that he knew or should have known of the alleged fraud. These undisputed

facts are used to support conjecture. They do not support a powerful and cogent inference that he was in fact exposed to information that would have alerted him to the alleged fraud. See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 279 (3d Cir. 2006) ("fraud by title" not enough – facts as to the specific knowledge and conduct of each defendant corporate officer was required). Plaintiffs only surmise Cohn must have known or recklessly turned a "blind eye" to the fraud. Yet the record shows just the opposite – that DVI's senior management deceived him.

The record suggests that Cohn had an honest belief that DVI's loan compliance problems were either cured or were infractions that could be cured in the ordinary course of business without irreparable damage to DVI. And no admissible evidence has been proffered that might serve as a basis to controvert his stated beliefs. Moreover, Cohn's testimony is corroborated by the testimony of others – most notably, by Garfinkel and Cruikshank. The proposed inference to the contrary – that Cohn was intentionally dishonest or deceptive – is wholly without support on this record.

Other than Cohn's postion and status, Plaintiffs' argument relies largely on the Examiner's Report. They cite conclusions and opinions contained therein as evidencing various matters asserted in this litigation. See, e.g., Pls. CSOF ¶¶ 17, 18 (citing as evidence of scienter Ex'r Rep. at 13-14, 151, 169, Doc. Nos. 274-1 at 23-24 & 274-3 at 1, 19). Why those statements should be considered here as evidence defeating summary judgment is never explained. Cohn challenges the reliability of the Report, contending that it "does not accurately reflect the true facts – as became crystal clear during discovery." Def. Br., Doc. No. 257-13 at 19-20. The objections are well-founded. The Report in its entirety is neither accurate nor reliable evidence in this case – for several reasons as follows.

In the bankruptcy case, the U.S. Trustee moved under 11 U.S.C. § 1104(a) & (c) for appointment of an examiner to investigate the Debtors "in the interests of creditors, any equity security holders, and other interests of the estate."[18]  See In re DVI, Inc., DVI Fin. Serv., Inc., & DVI Bus. Credit Corp., Case No. 03-12656 (Bankr. D. Del. Aug. 25, 2003), Doc. No. 434 at 8. The U.S. Trustee selected and applied for an order appointing R. Todd Neilson, CPA as the Examiner, and by Order dated October 14, 2003, the court approved the appointment "in the interests of the estate."  See Doc. Nos. 568, 572, 573, 578, 624.  The Examiner was ordered to investigate the Debtors' financial transactions, accounting practices, "any and all allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or financial and/or corporate irregularities relating to the Debtors and the circumstances surrounding same" as well as "potential claims of the Debtors against current and former directors and officers and others." Doc. No. 568 at 1-2.  The Examiner, Official Committee of Unsecured Creditors, and Debtors were ordered to cooperate in the investigation "fully" and "reasonably."  Id. at 2.  As approved by the court, the Examiner retained a law firm and his certified public accounting firm, Neilson Elggren LLP, as the accountant for the investigation.  Nov. 26, 2003 Order, Doc. Nos. 811, 912. On April 7, 2004, the Examiner's Report was issued, and it was filed on the court's docket the next day.  See Nov. 5, 2003 Tr. of Omnibus Hr'g, Neilson Test., Doc. No. 933 at 55-61; Ex'r Rep. with Exhibits of materials reviewed, Doc. Nos. 1648-1650.

---

[18]  The statute in part: "[A]t any time before confirmation of a plan, on request of a party in interest or the United States trustee under this section, and after notice and hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by former management of the debtor, if – (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . ."  11 U.S.C. § 1104(c)(1).

From commencement of the bankruptcy case through conclusion of the Examiner's investigation, no trustee was appointed. DVI, DVI FS, and DVI BC were debtors in possession. The U.S. Trustee was not the trustee in bankruptcy. "U.S. Trustees are officers of the Department of Justice who protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings." United Artists Theatre Co. v. Walton, 315 F.3d 217, 225 (3d Cir. 2003); In re South Beach Sec., Inc., 606 F.3d 366, 370-71 (7th Cir. 2010) (Posner, J.) ("whose role is to be a watchdog" and "guardian of the public interest in bankruptcy proceedings" ). The U.S. Trustee is a party in interest with standing to make motions and be heard in bankruptcy cases. United Artists, 315 F.3d at 225; South Beach, 606 F.3d at 372; see 11 U.S.C. § 307 ("may raise and may appear and be heard on any issue in any case or proceeding"). As the U.S. Trustee's appointee, the Examiner also acted on behalf of the interests of the estate for the benefit of its creditors:

> The purpose of an examiner's investigation in bankruptcy is to discover whatever assets may exist for the estate of the bankrupt, just as one purpose for the appointment of a trustee is so that a trustee may use statutory powers conferred by the Bankruptcy Code to collect all property belonging to the debtor for the benefit of the debtor's creditors.

In re Ionosphere Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993) (Sweet, J.), aff'd, 17 F.3d 600 (2d Cir. 1994).

Given the scope of the Examiner's investigation – comprising in particular an assessment of allegations of fraud and potential claims against DVI's officers and directors – the Examiner's and Cohn's interets were not the same or necessarily aligned. They were potentially adverse. However, the investigation was not conducted under the adversarial safeguards afforded by the Federal Rules of Civil Procedure. It was, as noted by the Examiner, a "cooperative,"

"collaborative," and "coordinated" effort, involving a host of persons and entities with competing interests: many governmental agencies – among them, the SEC and FBI (Federal Bureau of Investigation), the Debtors' present and former employees, executives, and directors as well as other parties in interest in the bankruptcy case and their representatives. See Ex'r Rep. at 3-4, 18-20, 26, Doc. No. 274-1 at 13-14, 28-30, 36. Unlike civil discovery, the Examiner alone set the criteria and methods for investigation. As he candidly commented, the "process of selection [of transactions for review] was not based on a rigid methodology; instead, it was a fluid process that evolved over the five-plus months of the . . . inquiry." Id. at 28, Doc. No. 274-1 at 38. In essence, the investigation was what it was supposed to be – "a 'fishing expedition,' as exploratory and groping as appear[ed] proper to the Examiner." Ionosphere, 156 B.R. at 432.

The record compiled by the Examiner "is not a judicial record, but simply a source of information designed for the purpose of identifying the assets of the estate for the eventual benefit of the debtor and its creditors." Ionosphere, 156 B.R. at 432 (citing In re Baldwin United Corp., 46 B.R. 314, 317 (Bankr. S.D. Ohio 1985) (comparing the examiner to a 'civil grand jury' investigating to ascertain legitimate areas of recovery and appropriate targets for recovery)). See also In re Gitto Corp., 422 F.3d 1, 15-16 (1st Cir. 2005) (report's purpose was to create a base of information sufficient for creditors to assess whether they may have claims against management, shareholders, or others). Moreover, an examiner's identification of assets and potential claims for recovery is not an adjudication:

> "The primary function of an examiner is to investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case, including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former management." . . . He is a fact-finder in the colloquial sense of the term. He discovers facts for the benefit of the creditors as directed by the Court. He does

> not, however, issue judicial 'findings of fact' as a court does under [Fed.R.Bankr.P.]
> 7052. . . . He is not an extension of the Court. The Examiner's mere review of
> documents does not 'elevate' the documents to the status of judicial records.

In re Apex Oil Co., 101 B.R. 92, 98-99 (Bankr. E.D. Mo. 1989) (quoting In re Gilman Serv., Inc.,

46 B.R. 322, 327 (Bankr. D. Mass. 1985)); accord Ionosphere, 156 B.R. at 432. In sum, the

results of Examiner Neilson's investigation of the types of allegations described in 11 U.S.C. §

1104(c) – in particular, "allegations of fraud, dishonesty, incompetence, misconduct,

mismanagement, or irregularity in the management of the affairs of the debtor" – are not judicial

records or judicial findings of fact.

Here, the Examiner's Report memorialized a tentative, preliminary position. The Report

acknowledged that the ordered topics for investigation were "only the starting point" in

understanding DVI's financial condition. Ex'r Rep. at 186, Doc. No. 274-3 at 36. The Report

catalogued many issues meriting further investigation in the Examiner's opinion. See, e.g., id.

(list of topics). As to DVI's executives and directors – and in particular, Cohn, the Examiner did

not express "any opinion on the precise legal claims and causes of action that may exist against

such individuals." Id. at 187 & n.59, Doc. No. 274-3 at 37. Notably, the Examiner did not find

that Cohn acted with intent to deceive, manipulate, or defraud. Ex'r Rep. at 13-14, 151, 169,

Doc. Nos. 274-1 at 23-24 & 274-3 at 1, 19 (only surmising what Cohn might or might not have

known, and what he should have done if he had known). Moreover, discovery in this litigation

has proven the Examiner's factual findings as to Cohn's conduct and state of mind to be

inaccurate, if not plainly false.

In some instances, Plaintiffs incorrectly treat the Examiner's statements as findings by the

bankruptcy court that should bind the parties here as to various factual determinations. His

statements are not judicial findings with any res judicata effect.  See Ionosphere, 156 B.R. at 432-33 ("Examiner's findings are no more binding on the court than those of any other attorney's"); Apex Oil, 101 B.R. at 99 (same); Baldwin, 46 B.R. at 316 ("his findings do not have the binding effect on the Court or parties of those of a special master, arbitrator or magistrate; nor do they have the evidentiary character of an opinion by a Court expert appointed pursuant to Rule 706 of the Federal Rules of Evidence").  It does not appear that the bankruptcy court ever adopted or accepted the Examiner's Report in an adjudication of substantive rights on a disputed matter.

In other instances, Plaintiffs treat the Examiner's statements as admissible to prove the truth of various matters said to be asserted in his Report.  See, e.g., Pls. Br. at 6, 8, 9-10, Doc. No. 272 at 6, 8, 9-10 (citing Ex'r Rep. at 13-14, 151, 169, Doc. Nos. 274-1 at 23-24 & 274-3 at 1, 19).  But the Report and the statements it contains were not made while testifying at a deposition or hearing in this litigation – they are hearsay.  Fed. R. Evid. 801.[19]  To be considered as evidence in this case, it is must be demonstrated that the Report and its contents conform with one of the exceptions to the hearsay rule.  No showing in this regard is made.  Perhaps Plaintiffs proffer the Report as a public record under Federal  Rule of Evidence 803(8)[20] – an exception to the hearsay rule that might apply to an evaluative investigation report.  Such an argument would be unsuccessful, however.  The Report and the statements it contains are hearsay that do not qualify for this exception from the general rule of exclusion.

[19] "'Hearsay' means a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

[20] A public record is a "record or statement of a public office if:  (A) it sets out:  . . . (iii) in a civil case . . . , factual findings from a legally authorized investigation; and (B) neither the source of information nor other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).

The rationale of Rule 803(8) "is explicated in the advisory committee's notes as being grounded on a presumption of reliability of government records."  Coleman v. Home Depot, Inc., 306 F.3d 1333, 1341 (3d Cir. 2002) (Becker, J.) (citing Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 505 F. Supp. 1125, 1145 (E.D. Pa. 1980)[21] ("circumstantial guarantees of trustworthiness are provided by the presumption that governmental officials will perform their duties faithfully")).  By its express terms, Rule 803(8) applies to "factual findings from a legally authorized investigation."  Id. at 1342.  The Supreme Court has interpreted this phrase broadly to encompass conclusions and opinions arising from a factual investigation:

> In the first place, it is not apparent that the term "factual findings" should be read to mean simply "facts" (as opposed to "opinions" or "conclusions").  A common definition of "findings of fact" is, for example, "[a] conclusion by way of reasonable inference from the evidence."  Black's Law Dictionary 569 (5th ed. 1979).  To say the least, the language of the Rule does not compel us to reject the interpretation that "factual findings" includes conclusions or opinions that flow from a factual investigation.

Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 163-64 (1988); id. at 162 n.7 (citing an example of the broader rule, Melville v. Am. Home Assurance Co., 584 F.2d 1306, 1315-16 (3d Cir. 1978)).

The principal basis on which government records and reports may be excluded is the Rule 803(8)(B) trustworthiness proviso – evaluative reports are admissible unless "the source of information [or] other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  As Rainey explains, this safeguard is designed to exclude unreliable evidence:

> This trustworthiness inquiry – and not an arbitrary distinction between "fact" and "opinion" – was the [Advisory] Committee's primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all

---

[21] Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 505 F. Supp. 1125 ((E.D. Pa. 1980), aff'd in part & rev'd on other grounds in part sub nom. In reJapanese Elec. Prod. Antitrust Litig., 723 F.2d 238, 275 (3d Cir. 1983), rev'd sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

elements of the report. Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof – whether narrow "factual" statements or broader "conclusions" – that she determines to be untrustworthy.

488 U.S. at 167-68 & n.11 (Advisory Committee proposed a nonexclusive list of four factors as

"helpful in passing on this question"); see also Coleman, 306 F.3d at 1341-42 (discussing factors

for evaluating trustworthiness).

As was explained by Judge Becker, an evaluative investigation report is untrustworthy

"if the report appears to have been made subject to a suspect motivation. For example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias." . . . [And a] report might also be untrustworthy where it is made in contemplation of litigation.

Coleman, 306 F.3d at 1342 (quoting Federal Rules of Evidence Manual 1688-89 & n.129

(Stephen A. Salzburg et al. eds., 7th ed. 1998); accord id. at 803-69 (Stephen A. Salzburg et al.

eds., 10th ed. 2011) (citing N.J. Turnpike Auth. v. PPG Indus., Inc., 197 F.3d 96 (3d Cir. 1999));

see also Michael H. Graham, 7 Handbook of Federal Evidence 372 n.23, 379 & n.26 ( 7th ed.

2012) (citing Coleman); id. at 340-44 & n.8 ("Rule 803(8) does not provide a blanket hearsay

exception for reports or statements made by non-public officials to public officers even when

made pursuant to statutory duty.").

Here, the Examiner's Report in its entirety is not not trustworthy. The Report reflects

what Judge Becker referred to as an "institutional bias" – it was prepared at the request an

interested party, the U.S. Trustee, largely to determine whether there were bona fide reasons to

pursue claims on behalf of the estate for the benefit of the creditors. Pertinent here, it was

prepared in contemplation of litigation against DVI's directors – namely, Cohn. Importantly, the

Report is not the product of fair adversarial discovery with appropriate safeguards for defendants

in this action.  Moreover, the Report and its contents are based on interviews and materials

supplied by many persons with competing interests in the outcome of the bankruptcy case.  It was

issued and docketed without a hearing on its contents.

Plaintiffs' use of the Examiner's Report is closely comparable to the plaintiff New Jersey

Turnpike Authority's use of certain "Directives" in N. J. Turnpike Auth. v. PPG Indus., Inc.,

supra (Rendell, J.; Becker,J., concurring because "the Turnpike failed to exerice diligence in

discovery").  In essence, the Directives put the defendants on notice that the New Jersey

Department of Environmental Protection (NJDEP) believed them to be responsible for

discharges of hazardous substances.  Some Directives also set forth the NJDEP's findings based

on its own investigation, prior investigations, and actions of other parties as well as records made

in connection with those cases.  Id., 197 F.3d at 100-01.  In moving for summary judgment, the

Turnpike relied heavily on statements contained in the Directives.  In a cross-motion for

summary judgment, the defendants challenged the Directives as nothing more than a form of

notice pleading used to serve notice of potential liability for costs of clean up.  Also, they

contended, the factual findings contained in the Directives were "not the result of an adversarial

process."  Id. at 110.  Our Court of Appeals ruled that defendants had "the better argument," and

it was "not convinced that even if probative, the Directives would constitute admissible evidence

under Rule 803(8)(C)," the predecessor of Rule 803(8).  Id. at 109-10 & n.20.

As proferred in this litigation, the Examiner's reported findings, conclusions, opinions,

and recommendations would be inadmissible hearsay and opinion testimony at trial under

Federal Rules of Evidence 801(c) and 701.[22]  "Hearsay statements that would be inadmissible at

---

[22] "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one
that is:  (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's
testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized
knowledge within the scope of Rule 702."  Fed. R. Civ. P. 701.

trial may not be considered for purposes of summary judgment." Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). See also N.J. Turnpike Auth., 197 F.3d at 112 (citing Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999) (citing Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (hearsay that is not capable of being admitted at trial should not be considered at summary judgment stage)). On the other hand, "[i]n this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." Sheldon v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000). Nevertheless, the hearsay nature of the Examiner's Report cannot be corrected – the Report in its entirety is untrustworthy and not admissible as a public record under Rule 803(8). And it does not qualify for any other exceptions from the general rules of exclusion, Rules 801(c) and 701.

B.    Section 20 Claims

"Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)." Suprema, 438 F.3d at 284 ("plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws"). Here, it is alleged that Cohn controlled DVI, and DVI committed a primary violation of the securities laws. However, the record is devoid of any evidence that he did so.

Plaintiffs have the burden of demonstrating that Cohn was a control person within the meaning of Section 20(a), including proof of an essential element – that he "had actual power or influence over the allegedly controlled person," DVI. In re DVI, Inc. Sec. Litig., No. 03-5336, 2005 WL 1307959, at *12 (E.D. Pa. May 31, 2005) (citing In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998)); accord id., 2013 WL 247149, at *9-10 (E.D. Pa. Jan. 23,

2013).  See 17 C.F.R. § 240.12b-2 ("The term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.").  Here, the allegations contained in the Complaint are not enough to meet this standard.  Nor do those allegations discharge Plaintiffs' burden as the non-moving party to this summary judgment proceeding.

The record establishes that Cohn did not exercise any actual power and influence over compliance with covenants contained DVI's agreements with its lenders.  His repeated insistence on compliance was acknowledged by senior management, yet apparently ignored in practice.  Instead, O'Hanlon and Garfinkel exercised the ultimate decision-making authority on those matters.  By deception, they succeeded in defeating Cohn's efforts to ensure compliance.

There is no evidence that Cohn controlled any of the policies or activities that are alleged to be fraudulent here.  For example, Cohn participated in making most of the decisions as to whether a domestic applicant's ability to repay a loan was adequate to justify financing in the amount of $1 million or more.  As a member of the credit committee, he had significant influence over those decisions.  But O'Hanlon and Anthony Turek, the head of the credit committee, effectively exercised ultimate authority over financing decisions.  Whereas Cohn insisted that loans in excess of the fixed limit be subject to his approval, apparently others by-passed the credit committee.  And there is no proof that Cohn fraudulently extended credit.

Another example:  Cohn – a respected director and substantial shareholder – had significant power and influence to participate in making corporate policies.  But there is no proof that he acted fraudulently in that regard or caused others to do so.  Similarly, there is no proof that his shareholdings afforded him the capacity to direct or cause the direction of DVI.  And he did not exercise any day-to-day control over DVI's management or operations.

48

Furthermore, the record contains no evidence that Cohn culpably participated in any wrongdoing. In particular, he did not participate at all in the accounting or reporting of DVI's financial information, including DVI's loan loss reserves. The record also shows that Cohn believed – in apparent good faith – that the challenged loan covenant infractions had been cured or were excusable. Numerous times, he presented to DVI's senior management practices that he believed should be corrected. When he learned of potential wrongdoing, he tried to understand what had happened and do what he could to correct it.

C.    Section 18 Claims

For some of the same reasons defeating the Section 10(b) claims, Plaintiffs' claims against Cohn under Section 18 of the Exchange Act also fail. They do so for several reasons.

Section 18 grants a right of action to any person who purchases or sells a security in reliance on a false or misleading statement of material fact included in any document filed with the SEC pursuant to the Exchange Act. 15 U.S.C. § 78r(a); Suprema, 438 F.3d at 283. Sections 10(b) and 18 both require proof of a misrepresentation or omission of material fact. See 15 U.S.C. § 78r(a) (in part, a plaintiff must show that the defendant made a statement, which "was at the time and in the light of the circumstances under which it was made false or misleading"). In contrast, however, a Section 18 plaintiff must also demonstrate "actual, as opposed to presumed, reliance upon a false or misleading statement." Id. at 283-84. This requires proof of reliance on specific statements contained in the SEC filings at issue. Id. In addition, a Section 18 defendant may avoid liability by showing "that he acted in good faith and had no knowledge that such statement was false or misleading." 15 U.S.C. § 78r(a).

Here, Plaintiffs have not come forward with the requisite proof. Even assuming that

Cohn signed DVI's annual Form 10-K filings during the pertinent time period, which has not

been established, there is no evidence that the filings were false or misleading when they were

filed with the SEC. In addition, Plaintiffs have not identified any specific portion of those filings

that they actually relied on in making their investment decisions. That they read and relied upon

the documents in general is not enough. Suprema, 438 F.3d at 283-84. Furthermore, Cohn's

affirmative defense presents no triable disputes – the record contains no evidence suggesting that

he knew any of DVI's public filings with the SEC were false or misleading.

And no evidence suggests that he acted otherwise than in good faith.

      D.      Common Law Fraud Claims

For reasons similar to those defeating the Section 10(b) claims, Plaintiffs' claims against

Cohn under Pennsylvania's common law of fraud also fail. The record does not establish the

requisite material misrepresentation or omission and culpable state of mind on the part of Cohn.

Pennsylvania's cause of action for fraud "resembles, but is not identical to" a private

action for federal securities fraud. Dura, 544 U.S. at 341; Sowell v. Butcher & Singer, Inc., 926

F.2d 289, 296 (3d Cir. 1991) ("similar" elements). Plaintiffs acknowledge as much. WM High

Yield Fund v. OHanlon, No. 04-3423, 2005 WL 6788446, at *12 (E.D. Pa. May 13, 2005). A

common thread running through these theories is the necessity for proof of fraudulent intent. See

Tellabs, 551 U.S. at 319 ("a mental state embracing intent to deceive, manipulate, or defraud")

(citation and internal quotation marks omitted); compare Bortz v. Noon, 729 A.2d 555, 560-61

(Pa. 1999) (a "representation . . . made falsely with knowledge of its falsity or recklessness as to

whether it is true or false . . . with the intent of misleading another into relying on it") (citing

Restatement (Second) of Torts § 525 (1977)); accord Weston v. Northampton Personal Care, Inc., 62 A.3d 947, 960 (Pa. Super. Ct. 2013). See further Muller-Paisner v. TIAA, 289 F. App'x 461, 463 (2d Cir. 2008) (dismissing Section 10(b) and common law fraud claims for failure to adequately allege a materially misleading misstatement or omission and scienter); Poth v. Russey, 99 F. App'x 446, 452-53 (4th Cir. 2004) (affirming summary judgment on Section 10(b) and common law fraud claims for lack of evidence of the same).

There is no evidence that Cohn made a public material misrepresentation. Even if it is assumed that he signed some of DVI's filings with the SEC, there is no evidence that they were misstated. And even assuming that they were misstated, it has not been shown that Cohn knew or should have known as much at the time that the documents were filed with the SEC.

IV.  CONCLUSION

The record does not establish triable disputes as to the essential elements of this private securities fraud action – a misrepresentation or omission of material fact, manipulative or deceptive conduct, and scienter. Given these shortcomings in the record, proof of reliance, loss causation, and damages would fail as well. Cohn cannot be held liable under Section 10(b) or Rule 10b-5. Also, liability cannot be imposed upon him under Section 20(a) as a person who controlled DVI, the alleged violator of the securities laws, Section 10(b), or under Section 18 as a person who made or caused to be made any false or misleading statement contained in any of DVI's filings with the SEC.

An order accompanies this Memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.